## THE NORTHERN TRUST COMPANY v. CONSOLIDATED ELEVATOR COMPANY.[1]

### March 21, 1919.

### No. 21,155.

**Warehouseman — notice to buyer of grain.**

1. Evidence considered and *held* to justify the trial court in finding, that the purchaser of grain from a warehouseman with whom it had been stored, bought in good faith without notice of the fact that its vendor did not own the grain.

**Same — buyer not chargeable with constructive notice.**

2. Unless the circumstances under which such grain was offered for sale were such as to make it the duty of a prudent and honest man to make inquiry concerning its ownership, the purchaser thereof was not chargeable with constructive notice of the fact that his vendor was only a bailee of the grain.

**Same — equities of buyer superior to those of surety of warehouseman.**

3. The equities of one who buys grain in the open market, in good faith and for full value, from a warehouseman with whom it was stored, are superior to those of the surety on the bond of the latter, given for the protection of those storing grain with it, where such warehouseman has become insolvent and the surety has been required to pay the amount of the bond.

**Surety of warehouseman not subrogated to rights of owners of grain.**

4. Because of the superiority of such purchaser's equities, the surety does not become subrogated to rights which the true owners of the grain may have had, to follow it into the hands of the purchaser and to hold the latter as for a conversion thereof.

**Buyer and surety become creditors of warehouseman.**

5. After such purchaser and surety had each paid the full amount for which it was ultimately liable, to the representative of all persons to whom such warehouseman had issued grain storage receipts, outstanding when it became insolvent, all equities between them ceased, and each became an independent creditor of the warehouseman, and was entitled to retain any moneys subsequently received in partial reimbursement of its original loss.

[1] Reported in 171 N. W. 265.

Action in the district court for St. Louis county to recover $10,355.51 for conversion of grain. The answer alleged, among other matters, that defendant purchased certain grain from the North Dakota Grain Company in good faith, in the usual course of business, without any knowledge or notice of any unlawful act on the part of the grain company, and, relying on the title of the grain company to the grain so purchased by it, paid the full market value of all grain so purchased, and the grain so purchased and received by defendant became the lawful property of defendant, and set up a counterclaim for $7,119.33. Plaintiff demurred to the answer. The demurrer to that part of the answer which set forth that there was a defect of parties defendant or that additional parties should be joined as defendants was sustained; the demurrer to other parts of the answer was overruled. The case was tried before Cant, J., who made findings and ordered judgment for $905.68 in favor of defendant on its counterclaim. Plaintiff's motion for amended findings of fact, conclusions of law and order for judgment, was granted in part and denied in part. Defendant's motion for amended conclusions of law was denied. From an order denying its motion for a new trial, plaintiff appealed. Reversed and new trial granted on certain issues only, unless defendant consent to entry of judgment for its costs and disbursements only.

*Middaugh & Coger* and *Pierce, Tenneson & Cupler,* for appellant.

*Francis W. Sullivan* and *Davis, Severance & Olds,* for respondent.

LEES, C.

Appellant, as surety on the bond of a public warehouseman given pursuant to the statutes of North Dakota, having paid the amount of the bond for the benefit of the owners of grain stored with such warehouseman, brought this action against respondent for the alleged conversion of such grain.

Respondent interposed a counterclaim for the amount it had been required to pay for the benefit of such owners. The warehouseman had become insolvent and failed to redeem the storage receipts it had issued for the grain. A jury trial was waived. The court denied relief to appellant and awarded $905.68 to respondent upon its counterclaim. This appeal is from an order denying a motion for a new trial.

A reversal is sought upon three grounds: (1) That the evidence did not justify the court in finding that respondent was a good faith purchaser of the grain; (2) that the court erred as a matter of law in finding that respondent's equities were superior to appellant's, and that, therefore, the latter had not become subrogated to the rights of the owners of the grain as against respondent; (3) that respondent was not entitled to recover upon its counterclaim.

There are numerous assignments of error, but all that we deem material rest on one or the other of the foregoing grounds.

These are the salient facts in the case: During the years 1915 and 1916 the North Dakota Grain Company, hereafter designated as "the grain company," was a licensed warehouseman' at Walum and Dazey, North Dakota. The law of that state required it to give a bond to protect the holders of receipts for grain delivered for storage. Appellant was its surety on such bond, which ran to the state, was for $10,000, and covered the period of two years from August 1, 1915.

On March 4, 1916, the grain company became insolvent. Between September 1, 1915, and that date it had received grain for storage at Walum and Dazey of the value of $23,137.78 and issued storage receipts therefor. In March, 1916, they were delivered by the holders to W. H. Stutsman, the president of the board of railway commissioners of North Dakota, for collection. He took possession of all the grain then in the company's elevators and sold it for $6,018.45.

Under the North Dakota law, the delivery of grain to a public warehouseman for storage is a bailment and not a sale of such grain. It is made the duty of the warehouseman to deliver to the holder of a storage receipt, on presentation thereof, an equal amount of the same grade of grain as is specified in the receipt, or, in lieu thereof, a receipt issued by any bonded terminal warehouse or elevator for an equal amount of grain of the same grade. Failure of a warehouseman to deliver the grain covered by a storage receipt or pay the market value thereof is larceny. Comp. Laws N. D. 1913, §§ 3113, 3114 and 3115.

It having developed that respondent had bought nearly all the wheat the grain company had received for storage, Mr. Stutsman on April 20, 1916, made demand upon it for payment for such wheat and received respondent's check for $8,000. The proceeds of the check were to be used

towards taking up the outstanding storage receipts, and Stutsman was to collect the amount of the bond from appellant and use the money for the same purpose, and the receipts were to be assigned to and divided between the parties in proportion to the amounts they severally paid him. Thereafter he made demand on appellant for the payment of the penalty of the bond, and received its check for $10,000. After taking up the storage receipts, he had left the sum of $880.67. This amount he refunded to respondent, delivering at the same time assigned storage receipts amounting to $7,119.33. The remaining receipts were assigned and delivered to appellant.

The grain company was licensed in Minnesota as a grain commission merchant. It was a member of the Duluth board of trade and the Minneapolis chamber of commerce. It dealt in grain on exchange at both places. It commingled the wheat it received at Walum and Dazey in bins in its elevators, and from time to time carload shipments were made from the common mass, consigned to it at Duluth where it was sold to respondent. The latter is a Minnesota corporation operating four terminal elevators at Duluth. It dealt with the grain company from 1912 until it became insolvent, and purchased from it annually from 175 to 375 carloads of wheat.

Respondent did not actually know that any of the wheat it purchased was stored with the grain company, and would not have purchased it had it known that fact. No investigation was made before it was purchased to ascertain whether it was in fact owned by the grain company.

The company had borrowed $20,000 from respondent. The loan was secured by chattel mortgages on its elevators and by pledge of its membership in the board of trade, and was made to enable it to buy grain in the country. Respondent was to have "first call" on the wheat as it came to market.

On May 24, 1916, appellant received $905.68 from certain elevator companies as the result of demands made upon them for stored oats, barley and rye purchased from the grain company. Later on it recovered judgment against the company and its officers for $9,558.67. An execution issued thereon was returned unsatisfied.

The briefs and oral arguments have taken a wide range, but, as we view it, the decisive questions lie within a narrow compass. In consid-

ering these questions, we have been greatly aided by a clear statement of the views of the learned trial judge which led to the disposition made of the case in the court below.

1. The vital finding of fact is the one which sustains respondent's contention that in purchasing the wheat it acted in good faith and without notice of the fact that the grain company was selling stored grain. All the evidence lying behind this finding has been weighed, and the arguments of counsel attacking and defending the finding have been given due consideration. Our conclusion is that the evidence is not so clear and convincing as to have required the court to find in appellant's favor on this issue. There was no proof that respondent had actual notice of the fact that the wheat was not owned by the grain company. Appellant's contention is that the evidence discloses a situation which charged respondent with constructive notice of that fact. Among the circumstances relied on by appellant are the following: Respondent was a creditor of the grain company and held chattel mortgages on all of its property. It had the "first call" on all wheat it shipped to Duluth. It knew that country elevators received grain for storage. The offices of both companies were on the same floor of the board of trade. It advanced money to the grain company on its bills of lading before the grain was offered for sale on the board of trade and was repaid when it was sold.

On the other hand, respondent points to the fact that the grain company was a licensed commission merchant in Minnesota, and asserts that it had a right to assume that in selling grain the company was acting as such commission merchant. It appears that the building in which the offices of the two companies were located is the building where practically all grain dealers in Duluth have their offices. None of the stockholders or officers of the one company were stockholders or officers of the other. The wheat was purchased on the floor of the board of trade in the usual and ordinary manner at its fair market price. There had been similar transactions between the parties for several years and no one had previously questioned them.

Under the law of North Dakota, a public warehouseman does not become a wrongdoer by shipping stored grain to a terminal elevator. Marshall v. Andrews, 8 N. D. 364, 79 N. W. 851; State v. Daniels, 35

N. D. 5, 159 N. W. 17.    Naturally the proprietor of such an elevator would have no cause to suspect that the warehouseman was wrongfully disposing of the grain shipped.

The doctrine of constructive notice has been stated in numerous decisions of this court.    The tendency is not to extend but rather to restrict the doctrine.    Jewell v. Truhn, 38 Minn. 433, 38 N. W. 106; Kettle River R. Co. v. Eastern Ry. Co. 41 Minn. 461, 476, 43 N. W. 469, 6 L.R.A. 111.    Respondent cannot be charged with constructive notice that the grain company did not own the wheat it sold, unless it had knowledge of facts which would naturally lead an honest and prudent person to make inquiry concerning its right to sell it, and such inquiry, pursued in good faith, would have disclosed that its vendor did not own it.    Twichell v. Glenwood-Inglewood Co. 131 Minn. 375, 155 N. W. 621; Brockman v. Brockman, 133 Minn. 148, 157 N. W. 1086. The rule fairly applicable to the facts in the case at bar is stated in United States v. Detroit Lumber Co. 200 U. S. 321, 26 Sup. Ct. 282, 50 L. ed. 499, as follows:

"No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying the full value for the same, acquire the rights of a purchaser in good faith. * * * When a person has not actual notice, he ought not to be treated as if he had notice unless the circumstances are such as enable the court to say, not only that he might have acquired but also that he ought to have acquired it but for his gross negligence in the conduct of the business in question. * * * What makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell."

2. Appellant contends that the original holders of the storage receipts had a right of action against respondent for the conversion of their grain and that it has become subrogated thereto.    We are not here concerned with the rights of appellant as against the grain company.    Those rights have been asserted in the action which resulted in the recovery of a judgment against it.    If respondent is liable to appellant at all, liability must arise through some application of the rule whereby a surety who

has made good the default of his principal is subrogated to the rights and remedies of creditors of the principal against third persons. The doctrine of subrogation is of purely equitable origin and nature. Whether a case for its application arises in favor of a surety as against third persons depends upon the balance of equities between them and the surety. It does not arise where the result would be prejudicial to innocent purchasers. The object of subrogation is to place the charge where it ought to rest, by compelling the payment of the debt by him who ought in equity to pay it. It will never be enforced when the equities are equal or the rights not clear. The right may be modified or extinguished by contract. It expires if it appears that at the time of payment the purpose was not to keep the debt alive but to extinguish it. When it is sought to enforce the right, something more must be shown than that defendant could have been compelled by the original creditor to pay the debt. While a surety may assert the right against one with whom he had no contractual relations, it must appear that the defendant participated, with notice, in the illegal act of the principal which served to bring about the loss. The right to recover from a third person does not stand on the same footing as the right to recover from the principal. As to the latter, the right is absolute; as to the former, it is conditional.

These principles find support in the following cases: Ahern v. Freeman, 46 Minn. 156, 48 N. W. 677, 24 Am. St. 206; Emmert v. Thompson, 49 Minn. 386, 52 N. W. 31, 32 Am. St. 566; Cooper, Myers & Co. v. Smith, 139 Minn. 382, 166 N. W. 504; National Surety Co. v. Arosin, 198 Fed. 605, 117 C. C. A. 313; U. S. Fidelity & G. Co. v. Title G. & S. Co. 200 Fed. 443; First National Bank v. City Trust, etc., Co. 114 Fed. 529, 533, 52 C. C. A. 313; Baker v. American Surety Co. 159 N. W. 1044; American Bonding Co. v. State Savings Bank, 47 Mont. 332, 133 Pac. 367, 46 L.R.A.(N.S.) 557; Grand Council v. Cornelius, 198 Pa. St. 46, 47 Atl. 1124; American Bonding Co. v. National Mechanics Bank, 97 Md. 598, 55 Atl. 395, 99 Am. St. 474, with note; Stewart v. Commonwealth, 104 Ky. 489, 47 S. W. 332; Bowles v. Gantenbein, 83 Ore. 510, 163 Pac. 308, 1163; Liles v. Rogers, 113 N. C. 197, 18 S. E. 104, 37 Am. St. 627.

We have examined the statutes of North Dakota and the cases in that

jurisdiction cited in appellant's brief, and find nothing therein which gives rise to a "statutory right of subrogation" which enlarges appellant's equitable rights. In that state the right will not be enforced against a bona fide purchaser without notice. U. S. Fidelity & G. Co. v. Citizens' State Bank, 36 N. D. 16, 161 N. W. 562, L.R.A. 1918E, 326. If the law of North Dakota differed from that of Minnesota in this respect, it is doubtful if it would control. Lewis v. Bush, 30 Minn. 244, 15 N. W. 113; Swedish-American Nat. Bank v. First Nat. Bank, 89 Minn. 98, 120, 94 N. W. 218, 99 Am. St. 549.

The equities in this case are with respondent. It paid full value for the grain in question. The grain company was worth as much after each transaction with defendant as it was before. There was no depletion of its resources. While it could no longer return their grain to the rightful owners, it had obtained for it an equivalent in money. It is the only wrongdoer. If appellant's contention were sustained, respondent would have to pay a second time for grain it had once bought and paid for in good faith, in order to protect from loss the surety on the bond of the warehouseman who wrongfully sold the grain. The surety on such a bond in effect guarantees that his principal will return stored grain to the owners or pay them for it. He ought to shoulder the loss if his principal fails to make good his undertaking. He cannot pass it on to an innocent third person by invoking the aid of the equitable doctrine of subrogation. Appellant occupies virtually the same position as the surety in Cooper, Myers & Co. v. Smith, 139 Minn. 382, 166 N. W. 504. The decision in that case practically controls the phase of the case at bar now under consideration.

3. The court awarded respondent upon its counterclaim $905.68 appellant had collected as heretofore stated, saying "plaintiff should, however, pay the full amount of the face of the bond for the benefit of the ticket holders. For the difference remaining between the amount which it paid, and the face of the bond in question, the defendant should be allowed a recovery." As we view the evidence, it conclusively appears that the parties intended to pay to Stutsman, as the representative of the holders of the storage receipts, a sum sufficient to enable him to redeem all such receipts. Their acts indicate that it was understood that a settlement should be made with Stutsman, that appellant should pay

the amount of its bond, and respondent enough more to enable him to take up all the outstanding receipts. This was strictly in accordance with their ultimate liability to the receipt holders.

This was the situation when the grain company became insolvent: It was primarily liable for the payment of $23,137.78. Its liability was reduced to $17,119.33 by the sale of all the grain it had in its elevators. Appellant was next in the order of liability, to the maximum amount of $10,000, which it paid, thereby discharging all liability upon the bond. Respondent was last in the order of liability, and $7,119.33 which it paid discharged its liability. The receipt holders, being paid in full out of these funds, no longer had an assignable cause of action against anyone. After they dropped out, appellant had a valid claim against the grain company for $10,000, and respondent one for $7,119.33. Each became an independent creditor of the company, entitled to pursue any remedies which were available to it as such creditor. Appellant had no right of action against respondent for reasons already stated.

Respondent's theory was that it should have received part of the $10,000 appellant paid, because it obtained assignments of storage receipts amounting to $7,119.33. This theory was not adopted by the trial court and there has been no appeal from its decision of this issue. If respondent had received its pro rata share of the $10,000, there would not have been money enough left in Stutsman's hands to pay the other receipt holders in full. The bond did not amount to more than approximately ten-seventeenths of the sum required to satisfy the receipt holders after he sold the grain that came into his possession. For the remaining seven-seventeenths, respondent was ultimately liable. It recognizd this liability when it gave its check to Stutsman. Both parties made statements in writing in connection with their several payments to Stutsman. Each appears to have been manoeuvering for position as against the other. Our conclusion is that each voluntarily paid only that which it was justly bound to pay, and that neither has any standing in equity to assert a claim against the other. It follows that after paying no more than each was bound to pay, both were free to recoup their losses independently. Thereafter, if the diligence of appellant bore fruit in a partial reimbursement of its loss, respondent could not demand that it share in its good fortune.

It is the rule that where two persons are called upon to pay the debt of a third, and each pays the amount for which he is ultimately liable and no more, the equities between them cease and each becomes an independent creditor of the principal for the amount paid for him. In such case, if one afterwards receives payment or indemnity from the principal, the other is entitled to no part thereof. Messer v. Swan, 4 N. H. 481; Harrison v. Phillips, 46 Mo. 520; Urbahn v. Martin, 19 Tex. Civ. App. 93, 46 S. W. 291; Cramer v. Redman, 10 Wyo. 328, 68 Pac. 1003. Both parties are creditors of the grain company. Appellant has been partially reimbursed as such creditor, but is under no duty to turn over to respondent any portion of the amount it has collected.

The order denying plaintiff's motion for a new trial is reversed, and a new trial of the issues arising on defendant's counterclaim only is granted, unless, within 20 days after the filing of the mandate from this court to the district court, the defendant shall file in the latter court its consent to the entry of judgment for its costs and disbursements in that court only, without any recovery upon its counterclaim. If such consent be so filed, the order denying a new trial shall stand and be affirmed.