## MARTIN et al. v. FEDERAL SURETY CO.
### No. 9234.

Circuit Court of Appeals, Eighth Circuit.
April 12, 1932.

H. C. Fulton, of Duluth, Minn. (Fryberger, Fulton & Boyle, of Duluth, Minn., on the brief), for appellants.

P. F. Sherman, of Minneapolis, Minn. (L. E. Melrin and Melrin, Brown & Sherman, all of Minneapolis, Minn., on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and CANT, District Judge.

KENYON, Circuit Judge.

Appellee, plaintiff in the trial court, brought action against appellants, Martin Brothers, as defendants, to recover moneys paid to the state of Minnesota as surety on a bond given by one Erskine who had purchased certain timber of the state but had not paid therefor; Erskine having sold the timber products to appellants. The surety company claimed under an alleged right of subrogation, and also by virtue of an assignment from the state of its claim against Erskine.

The trial court rendered judgment in favor of plaintiff. The facts were stipulated for purposes of the trial. Erskine purchased two tracts of timber from the state of Minnesota, and received state timber permits to cut the timber thereon. Appellee was surety on the bonds given by Erskine to the state to insure the performance of his contract with the state and to pay for the timber. Erskine entered into a contract to sell the manufactured timber products to Martin Brothers, who advanced him money to use in connection with the cutting and manufacturing of said timber. Erskine entered on the state land and cut the timber and delivered the same to Martin Brothers. He failed to pay the state the full amount due it, and the state demanded payment from appellee as surety. It paid the amount due and then demanded payment of the Martins for what it had been required to pay the state. The value of the timber purchased by the Martins from Erskine exceeded what appellee was required to pay the state. Each permit contained the provision: "Whereas, the statute provides and the purchaser agrees that the title to all of said timber before and after cutting, wherever found, shall remain in the state until full payment therefor, and that any attempted sale or disposition thereof by the purchaser before he has made full payment therefor as herein provided, shall be without force or effect, and the title of the state to said timber or the lumber manufactured therefrom shall continue unimpaired until the same and the whole thereof has been fully paid for as here-

in provided." The Martins, when they contracted with Erskine for the timber and when it was delivered to them, knew it was state timber; it was state marked. They did not know of the indemnity agreement.

The ultimate question in the case is whether appellee surety company was subrogated to the rights of the state against appellants who purchased the timber cut by the permit holder.

Certain statutes of the state of Minnesota applicable to the cutting of timber on state-owned lands are involved. We set out some sections of the General Statutes of Minnesota of 1923 thereof which bear on the question here:

Sec. 6364. "* * * The permit shall state the amount of timber estimated to be thereon, the estimated value thereof, and the price at which it is sold, or the price per thousand feet, in case it is sold by the thousand feet, and shall specify the bark, end or other mark to be used. A separate bark, end or other mark shall be used on the timber cut under each permit, and, if the permit covers more than one season, it shall specify a separate mark to be used each season. It shall provide that the purchaser shall place the specified mark upon every piece of timber cut, and also plainly upon the end thereof the stamp mark Minn., and, that, in case of any failure to place the stump mark upon any such piece, the state shall have the right to take possession of the same wherever found. It shall contain such other provisions as may be necessary to secure to the state the title of all timber cut thereunder, wherever found, until full payment thereof, and until all provisions of the permits have been fully complied with. * * * All permits shall be filed for record with such surveyor general."

Sec. 6383. "The auditor shall keep a record of all sales of timber in a book to be known as the timber sales book, and shall enter therein at the time each tract of timber is sold, and before selling another tract, the name of the purchaser, the price, and a description of the tract on which the timber is situated."

Sec. 6386. "If the amount of such statement be not paid immediately, it shall bear interest at the rate of eight per cent per annum from date; and, if not paid within thirty days, the treasurer shall place the account in the hands of the attorney general, who shall proceed forthwith to collect the same. Whenever the auditor shall deem it for the best interests of the state, he shall take possession of the timber for which such amount is due,

wherever the same may be found, and sell the same at public auction. The proceeds of such sale shall be applied, first, to the payment of the expenses of seizure and sale; and second, to the payment of the amount due for such timber, with interest; and the surplus, if any, shall belong to the state; and, in case a sufficient amount is not realized to pay such amounts in full, the balance shall be collected by the attorney general. Neither payment of such amount, nor the recovery of judgment therefor, nor satisfaction of such judgment, nor the seizure and sale of such timber, shall release the sureties on any bond given pursuant to this chapter, or preclude the state from afterwards claiming that such timber was cut or removed contrary to law, and recovering damages for the trespass thereby committed, or from prosecuting the offender criminally."

Sec. 6394. "The records kept by the auditor, pursuant to this chapter, shall be deemed notice of the facts therein set forth."

Other sections of the 1923 law which need not be set forth provide for various matters in connection with timber operations upon state lands by timber permittees. In 1925 the Legislature of Minnesota passed an act with reference to permit holders and in general relating to the cutting of timber in the state of Minnesota. From this we set out section 18, chapter 276: "In case of default in payment by the permit holder, the surety upon his bond may make payment in full to the state of all sums of money due under such permit; and thereupon such surety or sureties shall be deemed immediately subrogated to all the rights of the state in, or to, or in respect of, all the timber so paid for; and such subrogated party may pursue said timber and recover therefor, or have any other appropriate relief in relation thereto, which the state might or could have had if such surety had not made such payment. No assignment or other writing on the part of the state shall be necessary to make such subrogation effective; but the certificate of the state auditor, under his hand and official seal, showing the amount of such timber, the lands from which it was cut or upon which it stood, and the amount paid therefor, shall be prima facie evidence of such facts."

The trial court held that whatever remedies the state had against third parties for the claim which the plaintiff paid, plaintiff was subrogated to, that the state could have proceeded against the Martins to recover the timber or the value thereof, that they knew when Erskine delivered the timber to them that it was state timber, that they were bound to

know that he had no title to it unless it was paid for, and that as it was not paid for they acquired no title from Erskine, that the state had its choice of three remedies, viz., one against Erskine under the contracts, one against the Martins for converting the timber, and one against the plaintiff on his bond, that it chose to collect from plaintiff. After such collection it assigned to the plaintiff its claim against the principal on the bond.

Appellants argue that the surety company was not subrogated to the rights of the state under the common law, and had no right to subrogation under the statutes prior to the act of 1925, that the practical construction of the law prior to the statute of 1925 was against the subrogation right, that the state itself did not have the right to sue the Martins in conversion, that its rights were limited to taking possession of the timber wherever found or to recover from the permit holder or recover on the bond, that the right of subrogation in any event against a third party is limited to wrongdoers and that the Martins were not wrongdoers, further that the equities are with appellants, the surety company having received a premium for the assumption of the very liability which it now endeavors to pass on to the Martins, innocent third parties.

■ We consider first the questions raised by appellants as to the Minnesota statutes. One contention is that inasmuch as in 1925 the Legislature of Minnesota passed an act with reference to sureties on timber permit holders' bonds whereby such sureties were subrogated to all the rights the state had to pursue said timber and recover therefor and for any other relief which the state might have had if said surety had not made such payment (General Laws of Minnesota 1925, chapter 276, § 18), it is strong proof that subrogation to the rights of the state in these timber matters did not exist prior to the passage of this act. This enactment was after the facts had arisen upon which this case is based. If appellee has a right to subrogation, it must depend on common-law principles. The statutes of 1925 gave to the surety on permit holders' bonds *all* the rights of the state. Appellee here is claiming to be subrogated not to all the rights of the state but only *one*, viz., the right to sue a third party for conversion of unpaid-for timber. It must be noted that this is no extraordinary remedy of the state not available to ordinary property holders. The common law could well have permitted subrogation to the ordinary rights of the state acting in its business or proprietary capacity to sue for conversion without

including the extraordinary remedies existing by virtue of its sovereignty which would not be available to the ordinary private individual. The act of 1925 giving to the surety *all* remedies the state might have had, is not necessarily merely declaratory of the common law, nor need we determine whether it is an innovation thereon. Certainly the right to subrogation under common-law practice was not made unavailing by the fact of the enactment of the 1925 act.

■ Appellants argue that through the years while there was much litigation that grew up around these timber permits this is the first suit of this nature, and that no bond company either in the state courts or in the federal courts in the state of Minnesota has asserted the right of subrogation under such circumstances as are here presented, and that the idea was suggested by the adoption of the subrogation statute in 1925. Of course, we are not advised by anything in the record whether there have been suits in the trial courts or whether adjustments have been made in similar situations, but of course accept counsels' statement that in all these timber operations for these many years no such right has been asserted so as to appear in any court of record. It is urged this is strong evidence of a practical construction of the law as it stood prior to the passage of the subrogation act of 1925. We think it has little important bearing in the case. Counsel state in their argument that: "The purchaser of the manufactured product must always take into consideration the possibility that the timber itself may be taken into possession by the State, if the permit-holder fails to pay the State, but even here the purchaser would naturally rely upon the probability of the State going after the bonding company, which was the customary method." This case may have been instituted to break the custom, which custom if true apparently had its foundation in bad faith.

■■ Appellants further claim that the state had no right to sue the purchaser of the timber for a conversion. This argument is based on section 6386, General Statutes of 1923, which provides that: "Whenever the auditor shall deem it for the best interests of the state, he shall take possession of the timber for which such amount is due, wherever the same may be found, and sell the same at public auction." The argument is that sections 6386 and 6364 must be taken together, and that the only remedy for the state is to take possession of the timber, no reservation being contained in the law of a right to sue a

converter for the conversion of the timber. If this is so the state has lost the right to recover from those who may convert its property, which is an incident of legal title. The argument is interesting, but we think unsound. This timber was owned by the state in its proprietary capacity; it had exactly the same rights and remedies as a private individual owning the timber would have. There is no doubt that one of the incidents of title is the right to recover for the conversion thereof, and it makes no difference in the rule that the state is the owner of the property.

"In matters involving its proprietary or business functions, the state occupies the same position in the courts as private suitors. 26 Am. & Eng. Ency. Law, 485." State v. Shevlin-Carpenter Co., 99 Minn. 158, 108 N. W. 935, 939, 9 Ann. Cas. 634.

"The proprietary rights of a state are as absolute and unqualified as those of an individual." 25 R. C. L. 388.

"A state may adopt any remedy or employ any legal measures that a private suitor may use." 25 R. C. L. 408, Note 17.

In 26 Ruling Case Law, 1118, it is said: "Any person who purchases the personal property of another from one other than the owner or some one authorized to sell the same is liable in trover for the conversion of the property at the suit of the true owner, regardless of the fact that such purchaser may have acted in good faith, if the purchaser exercises ownership over the property purchased; as, for example, by selling the same."

Because the Legislature saw fit to prescribe the procedure by section 6386, supra, as to enforcing the remedy of taking possession of its property wherever found, is no reason to say that it abandoned all other remedies which it might have. Under section 6364 and the permits issued to Erskine, it retained full legal title to the timber and its manufactured products until paid for and its rights were not limited to the provisions of section 6386.

In 25 Ruling Case Law, 1054, 1055, § 280, it is said: "It is not to be presumed that the Legislature intended to abrogate or modify a rule of the common law by the enactment of a statute upon the same subject; it is rather to be presumed that no change in the common law was intended, unless the language employed clearly indicates such an intention. It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are so repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory."

It is clear that the Legislature by granting to the state additional rights and remedies did not relinquish the rights and remedies that it already had.

Appellants further argue that sections 6372 to 6385, inclusive, reference to which has heretofore been made, show that the Legislature intended the timber would be sold by the permit holder before the final payment by him to the state and therefore the Legislature could not have contemplated a suit in conversion against one who purchased the timber before final payment to the state. If these sections are inconsistent with a suit in conversion against the purchaser of timber before final payment to the state, they are just as inconsistent with any right in the state to take possession of the timber when it is in the hands of the same purchaser, although section 6386 expressly gives such right. The more onerous remedy as to a purchaser would seem to be the one which gives the right to take possession of the timber and retain the same and the full proceeds thereof, for the trespasser under the Minnesota law is liable for the full value of the property taken at the time and place of demand, while if he believed that he had a legal right to take the property then he is liable only for the value of the property at the time it was taken. State v. Shevlin-Carpenter Co., 62 Minn. 99, 64 N. W. 81; H. D. Williams Cooperage Co. v. United States (C. C. A.) 221 F. 234. Therefore a suit in conversion, instead of being the harsher remedy as argued, would not be so onerous as the remedy provided in section 6386, and it is hardly possible that the Legislature meant to abrogate the less onerous remedy that the state had possessed by granting the harsher remedy. We think the interpretation the appellants seek to place upon section 6386 of the General Statutes of 1923 as exclusive of any other remedy than therein provided is an interpretation that cannot be sustained.

■ That appellants converted the timber by purchasing it from Erskine and removing

the same while the state had title thereto cannot be a matter of doubt. E. E. Bolles Wooden-Ware Company v. United States, 106 U. S. 432, 1 S. Ct. 398, 27 L. Ed. 230; Bunker Hill & Sullivan Mining and Concentrating Company v. United States, 226 U. S. 548, 33 S. Ct. 138, 57 L. Ed. 345; United States v. Kennedy (C. C. A.) 206 F. 47; H. D. Williams Cooperage Co. v. United States (C. C. A.) 221 F. 234; Anderson et al. v. United States (C. C. A.) 152 F. 87; United States v. Miller (C. C. A.) 28 F.(2d) 846, 61 A. L. R. 405. These cases related to actions concerning timber cut on government lands but the principal is no different as to state lands. That the state of Minnesota could protect its title to property by ordinary common-law remedies in the absence of state statutes providing otherwise would seem reasonable and sound doctrine.

Preliminary therefore to discussing the controlling question in the case we may say that the state had title to the timber purchased by Martin Brothers, that the acts of appellants were sufficient to constitute a conversion, that the state could have proceeded against appellants in an action for conversion of the timber, that it had the same rights and remedies with reference to the same as any other property owners, and that these rights were not taken away either expressly or by implication by the statutes in force.

■■ While the state unquestionably would have had the right to proceed against appellants for conversion of its property, the determinative question is whether appellee was subrogated to that right. Subrogation is an equitable remedy, "a device adopted or invented by equity to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it." 25 R. C. L. 1312. Its purpose is to promote justice. The doctrine rests upon the general philosophy that a surety who has been compelled to pay the obligation of a defaulting principal has a stronger equity than the one originally liable to the creditor. If equities are equal, subrogation will not be enforced. It is enforced only in favor of a superior equity. It is merely the doctrine of a square deal and it is for a court of equity to say who, in good conscience, should bear a loss.

Appellants in arguing against the right of subrogation for the benefit of appellee propound three propositions to sustain their position:

First, that the remedies of the state are harsh and are such as ordinarily do not pass from the state to a private individual or corporation, except when especially granted by the law making body. We have referred to this previously in this opinion and have pointed out that the remedy by conversion is not as harsh as the remedy provided by section 6386 for the taking of the property. Any extraordinary and drastic remedies that might belong to a state by virtue of its sovereignty are not here claimed.

■ Second, that as appellee is a surety for hire, its rights are measured by different rules from those of the ordinary accommodation surety. It may be noted that practically all the cases cited in the briefs of appellants and appellee are cases of compensated sureties. In Bench Canal Drainage Dist. v. Maryland Casualty Co. (C. C. A.) 278 F. 67, 80, this court said: "The enforcement of the express terms of the contract of suretyship cannot be made to depend upon whether the surety is compensated or not. It cannot be one contract when the surety is compensated, and another contract when the surety is not compensated." Surely a compensated surety is not denied the right of subrogation if the necessary elements exist upon which to base it. That the surety was a compensated one, as distinguished from an accommodation surety, might bear on the general equities of the situation and have a place in the scale in the balancing of equities.

The third proposition advanced by appellants, that the right of subrogation against a third person is different from the right against the principal, is most important. As to this appellants argue that subrogation will not lie in this case as against them unless there was "culpable negligence" on their part, or that they "knowingly participated" in the original wrong. Some cases use the terms in dealing with this subject "morally wrong," "knowingly participate," "culpable negligence." The last phrase seems to have had its birth in a decision of this court in National Surety Co. v. State Savings Bank (C. C. A.) 156 F. 21, 28, 29, 14 L. R. A. (N. S.) 155, 13 Ann. Cas. 421. Judge Adams, who wrote the majority opinion, said with reference to the argument that the bank did not have actual knowledge and did not participate in the wrong perpetrated upon the county in the issuance of spurious refund orders: "The bank may not have been morally culpable; but its failure to discharge the duty of making inquiries suggested by the nonnegotiable character of the orders which it purchased, and by other circumstances attending the transaction, was an act of omission equally as effective to occasion injury to the county as many affirmative acts of commission could have been.

Such inquiry at the auditor's or treasurer's office would have quickly disclosed that the payees were entitled to nothing, that they were myths, and that misrepresentation, fraud, and forgery were being practiced upon the county. Ignorance in fact occasioned by indulging indifference to almost obvious danger and negligence of the grossest sort is entitled to little consideration by a court of conscience. The bank's negligence operated as effectually to defraud the county as any willful or intentional participation in the fraudulent scheme could have done. If the bank did not have actual knowledge of the fraud, it did have, under well-recognized law, constructive knowledge of all the facts which reasonable inquiry would have disclosed, and therefore of the fraud itself. Such knowledge in ordinary civil actions subjects its possessor to all the consequences of knowledge in fact, and we see no reason why it should not do so in the present case." Judge Adams, it will be noted, used the words "morally culpable." In United States Fidelity & Guaranty Co. v. Title Guaranty & Surety Co. of Scranton, Pa. (District Court, Maryland) 200 F. 443, 449, Judge Rose, referring to the decision in National Surety Company v. State Savings Bank, said the decision was based "on the distinct ground that the loss had resulted from the 'culpable negligence' of the defendant." Thus the doctrine grew. Subrogation was there denied on the ground that "there is no suggestion in this bill of any negligence on the part of the respondent, nor could there well have been." The National Surety case was again tried, its title then being National Surety Co. v. Arosin et al. (C. C. A.) 198 F. 605, 609, and this court reached a different result. The court said: "Upon the case now presented we agree with the court below that there was no negligence on the part of the Savings Bank and that the plaintiff is not entitled to recover as against it. * * * The evidence does not show any negligence on the part either of Arosin or of the National German-American Bank. There can be therefore no recovery against either of them." The court points out that "there was nothing in the transaction to excite the suspicion of the bank." Nothing was said in the opinion about the defendant not being guilty of "culpable negligence." The court based its opinion on the fact that there was *no negligence.*

In American Surety Co. of New York v. Citizens' Nat. Bank of Roswell, N. M. (C. C. A.) 294 F. 609, 616, the bill had been dismissed on demurrer. The surety on the official bond of a county treasurer who had purchased cashier's checks from defendant bank with county funds and forged the indorsement of the payees on the checks claimed to be subrogated to the rights of the county against the bank. The question was presented of the duty of the bank to make inquiry. The court held that the surety who had paid the county could not recover, saying, after referring to the decision in National Surety Company v. Arosin et al., where it appeared on trial that the bank was not negligent in the purchase of the order in the respect charged: "The right of subrogation is an equitable right, and where equities are equal the right does not exist and there can be no relief. The bill must show a superior equity in the plaintiff to withstand the attack of a demurrer. There was nothing in the transactions themselves between Davisson and appellee to apprise the latter that the former was engaged in misappropriating funds. It is not claimed that there was. Appellee did not knowingly participate in Davisson's unlawful purpose. It was an innocent instrument used by him, and it did in part what the law and its bond exacted of it and in part what any reasonably prudent banker would have done, for all that is charged in the complaint. Under the circumstances disclosed there was nothing to cast suspicion on the transactions and appellee was not bound to assume that Davisson was a wrongdoer, and on that assumption refuse to go on. Until there be reasonable ground to think otherwise, a presumption prevails that one acts honestly and keeps within the requirements of the law." The decision was based on the proposition that there was no negligence at all on the part of the bank and that it was not required to assume that Davisson was a wrongdoer. The phrases "morally culpable" or "culpable negligence" are not used anywhere in this opinion.

In Fidelity & Deposit Co. of Maryland v. Farmers' Bank of Bates County, Mo. (C. C. A.) 44 F.(2d) 11, the cases of American Surety Co. v. Citizens' Nat. Bank, supra, and National Surety Co. v. Arosin, supra, were grouped with American Bond Co. v. Welts (C. C. A.) 193 F. 978, Stewart v. Commonwealth, 104 Ky. 489, 47 S. W. 332, and American Bonding Company v. State Savings Bank, 47 Mont. 332, 133 P. 367, 46 L. R. A. (N. S.) 557, as having been based on the ground that the defendant against which the surety company was seeking to be subrogated was itself an obligee of the surety bond. Judge Booth said that in none of these cases "did it appear that the party sued by the surety company participated in or had full

knowledge of the misappropriations of the obligor." Judge Booth, page 18 of 44 F. (2d), referred to Empire Trust Company v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921, and Bischoff v. Yorkville Bank, N. Y., 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059, as follows: "In the Cahan Case it was held that the fact of knowledge by the bank that the deposits were funds not owned by the depositor and the fact of knowledge of their withdrawal did not constitute sufficient notice to charge the bank with liability for misappropriation of the funds by the depositor. In the Bischoff Case it was held that such facts and the additional fact of participation by the bank in the funds withdrawn by knowingly accepting payment therefrom of the depositor's debt to the bank did constitute sufficient notice to charge the bank with liability for the amounts so used, and for other amounts subsequently withdrawn and misappropriated by the depositor. We think the facts in the case at bar distinguish it from the Cahan Case and bring it within the Bischoff Case. It is to be further noted that in the Cahan Case the son had an unlimited power of attorney to draw checks. In the case at bar the power of the treasurer was limited and known so to be by the defendant bank." Subrogation was not involved in either of these cases. The question was: What constituted sufficient constructive notice to hold the bank liable to the original cestui que trust after having participated in a breach of trust? Richfield Nat. Bank of Richfield, Minn. v. American Surety Co. of New York et al. (C. C. A.) 39 F.(2d) 387, has slight, if any, bearing on this case, although it refers to the question of knowledge of an official's default. Subrogation was there granted. As far as this court is concerned, the use of the word "culpable" is confined to the opinion in National Surety Co. v. State Savings Bank, supra, and all Judge Adams really said was that on the facts before him the defendants were not necessarily "morally culpable," although he rather inferred that they did not have to be.

█ There is, in our judgment, no substantial basis in any of the cases in this circuit for the doctrine that in order to have the right of subrogation as against a third party, there must have been "culpable negligence" on its part. The doctrine grew from the use by the court in National Surety Co. v. State Savings Bank of the term "morally culpable," illustrating that while in nature "tall oaks from little acorns grow," in law erroneous doctrines from small phrases develop. It is fairly settled in this circuit by the decisions we have referred to that where subrogation is sought by a surety to the rights of the original creditor as against third parties, there must have been either participation in the original wrongful act or negligence on the part of the third party sought to be charged. But it is not necessary that such negligence be culpable or gross.

That there is some confusion in the doctrines relating to subrogation announced by the various courts is apparent. It is evidenced by the fact here that counsel for appellants and for appellee seem to claim in their respective briefs that the contention they urge is supported by the authorities cited by their opponent. After all each case must be determined in the light of the circumstances therein found.

We refer to a few of the cases:

In Cooper, Myers & Co. v. Smith et al., 139 Minn. 382, 166 N. W. 504, 506, plaintiff had purchased spurious certificates of a state official in ignorance of the fact that they were spurious and cashed them. It later under pressure returned the money to the state and then sued the sureties of the defaulting official, claiming to be subrogated to the right of the original creditor to proceed against them. The court held that in equity and good conscience plaintiff who innocently received the state's money through the fraud of the official and parted with an equivalent amount of its own should not bear the loss as against the sureties who for a consideration contracted for the faithfulness of the official. The case is important because of its discussion of constructive notice. The court said:

"It is conceded that, if the plaintiff had knowledge of the facts attending the issuance of the warrant, or notice which, if pursued, would have resulted in knowledge, or if it was negligent, it cannot recover.

"The warrant was assignable, but not negotiable. Its character suggested inquiry. It was in possession of Smith, whose apparent duty was to pay it. The state was in funds. Smith took it to Duluth, assuming to do so at the request of the school treasurer. The plaintiff, through an officer who had known Smith well for many years, bought it at its face and gave checks payable to Smith. Smith was of good repute. No investigation was made. An inquiry at the state auditor's office would have disclosed all. The transaction was very unusual. The fact that Smith was in possession of the warrant, endeavoring to sell it, when he was directed by its terms to pay it, naturally would have prompted inquiry."

See, also, on constructive notice, Maryland Casualty Co. v. Dulaney Lumber Co. et al. (C. C. A.) 23 F.(2d) 378; Richfield Nat. Bank of Richfield, Minn. v. American Surety Co. of New York et al. (C. C. A.) 39 F.(2d) 387.

Northern Trust Co. v. Consolidated Elevator Co., 142 Minn. 132, 171 N. W. 265, 267, 4 A. L. R. 510, is a much-quoted case. There the surety on the bond of a public warehouseman paid the holders of storage tickets the value of the grain which the grain company was unable to deliver, having transferred it to an elevator company. The surety sued the elevator company for conversion. The determining question as to the respective equities was constructive notice. The court held there was not sufficient constructive notice to hold the elevator company liable. The grain was purchased from a licensed commission merchant in the ordinary course of business with no knowledge that it was stored grain. There were no public records from which it could be learned as to where the title of the grain really was. Nor was there any statute as there is in this case making a record constructive notice to all parties. The court discussed constructive notice as follows: "Respondent cannot be charged with constructive notice that the Grain Company did not own the wheat it sold, unless it had knowledge of facts which would naturally lead an honest and prudent person to make inquiry concerning its right to sell it, and such inquiry, pursued in good faith, would have disclosed that its vendor did not own it." Speaking of subrogation the court says on page 268 of 171 N. W.: "When it is sought to enforce the right, something more must be shown than that defendant could have been compelled by the original creditor to pay the debt. While a surety may assert the right against one with whom he had no contractual relations, it must appear that the defendant participated, with notice, in the illegal act of the principal which served to bring about the loss. The right to recover from a third person does not stand on the same footing as the right to recover from the principal. As to the latter, the right is absolute—as to the former, it is conditional." The court, in its conclusion in holding that the equities were with respondent and referring to the surety on the bond guaranteeing that his principal will return stored grain to the owners or pay them for it, says with reference to shouldering the loss if the principal fails to make good the undertaking: "He cannot pass it on to an innocent third person by invoking the aid of the equitable doctrine of subrogation." Other Minnesota cases cited in the briefs, such as Greer v. Equity Co-operative Exchange et al., 137 Minn. 300, 163 N. W. 527, L. R. A. 1917F, 440, and In re Farmers' State Bank of North Branch, 174 Minn. 583, 219 N. W. 916, do not seem to be at all applicable to the questions here raised.

United States v. Detroit Timber and Lumber Co., 200 U. S. 321, 332, 26 S. Ct. 282, 285, 50 L. Ed. 499, refers to the doctrine that one is not bound to assume that a party with whom he deals is a wrongdoer, "and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying full value for the same, acquire the rights of a purchaser in good faith. Jones v. Simpson, 116 U. S. 609–615, 6 S. Ct. 538, 29 L. Ed. 742–744. He is not bound to make a searching examination of all the account books of the vendor nor to hunt for something to cast a suspicion upon the integrity of the title." The court was dealing with a case where the transfer to defendant had been made by one having apparently good title and in regard to which there were no suspicious circumstances —quite a different situation from here where the party selling had no title at all, a fact shown by public records. The doctrine announced fails where the party knows of a defect in title.

In American Bonding Co. of Baltimore v. State Savings Bank, 47 Mont. 332, 133 P. 367, 368, 46 L. R. A. (N. S.) 557, a surety on an official bond claimed the right to be subrogated to the rights of the county against a bank which purchased fictitious certificates issued by a deputy District Court clerk. The court refused to grant subrogation. It criticized National Surety Co. v. State Savings Bank, supra, and took the position that if the doctrine of that case was not overruled by National Surety Co. v. Arosin et al., supra, it would refuse to follow the same as unsound, and as opposed to the weight of authority. While the court denied subrogation, it said: "There is not any charge of negligence or wrongdoing on the part of the bank in purchasing the certificates. So far as the complaint discloses, the bank acted in perfect good faith and was following a common custom in dealing in these certificates without their bearing the impress of the official seal. Some one must suffer now for Farrell's official misconduct. Shall it be the bank, which acted in good faith and parted with its money for the spurious certificates issued by Farrell, or shall it be the surety company which

88

for a compensation undertook to be responsible for Farrell's official delinquencies, not only to the state and to Silver Bow county, but to this bank as well? To such an inquiry a court of conscience can make but one answer. Upon the showing made in its complaint, the surety company has failed to show itself entitled to be subrogated to the right which the county may have had." It is apparent that the court denied subrogation on the ground that the bank was entirely free from negligence.

In these leading cases to which reference has been made it is nowhere stated that the right of the surety to subrogation depends on "culpable negligence," or "morally wrongful" conduct as the test of the liability of the third person.

A number of Kentucky cases are referred to, and probably the most comfort to appellants' contention can be found in them. Stewart v. Commonwealth, 104 Ky. 489, 47 S. W. 332, is a much-quoted case. Stewart had purchased in good faith certificates of indebtedness that had been fraudulently issued to fictitious persons by a county official. The facts are somewhat similar to those in Cooper, Myers & Co. v. Smith et al., supra. Stewart collected these from the commonwealth. He was entirely innocent in the matter. The sureties on the bond of the dishonest official paid the county and proceeded against Stewart, claiming to be subrogated to the rights of the county. The decision denying the subrogation was predicated upon the innocence of Stewart and the fact also that he was a party protected by the surety bond. In American Bonding Co. of Baltimore v. First Nat. Bank of Covington et al. (Ky.) 85 S. W. 190, the court holds that as between a compensated surety and an innocent third person the surety is the one who in equity should bear the loss and is not entitled to be subrogated. It placed its decision upon this ground and cited the Stewart Case as settling the question. In Louisville Trust Co. v. Royal Indemnity Co., 230 Ky. 482, 20 S.W.(2d) 71, 72, an agent deposited funds belonging to his employer in defendant's bank. He withdrew them for private purposes. The agent's surety paid the employer and sought subrogation to the rights of the employer against the bank. The court denied the same, stating that the assignment taken some time after the indemnity company had discharged the obligation added nothing to the surety's rights against the trust company. It held that the proximate cause of the loss was the dishonesty of the agent rather than a want of care upon the part of the bank, and that while the

rule "as between the bank and the employer is settled, yet, in view of its extreme harshness, we are not inclined to go further and hold that the equities of a surety that has been paid to bear the loss are superior to those of the bank that receives no benefit from the transaction." It is clear that the court here made an exception to the ordinary rule of subrogation as it regarded the rule of law which would hold the bank liable to the original creditor a harsh one which should be avoided if possible, and of course the question of enforcing a harsh rule enters into the general situation of balancing equities between a surety company claiming subrogation and a third party.

It is to be noted as to this group of Kentucky cases that in each one the defendant was free from negligence of any sort and had no notice that should have put him on guard. The court was desirous of protecting him from a harsh rule of law, and the court seems to indicate in these various cases that defendant ought not to have been liable even to the original creditor, except in Stewart v. Commonwealth, supra, where the defendant was within the protection of the surety bond. These are important matters to keep in mind in considering the group of Kentucky cases and their bearing upon the question at issue here. To further review the cases would unduly extend this opinion, and we close such review with a very interesting expression on the general subject from American Bonding Co. v. National Mechanics' Bank of Baltimore, 97 Md. 598, 55 A. 395, 397, 99 Am. St. Rep. 466: "It remains to be determined whether the appellant, having as surety paid to the state the amount of its money thus converted by Vansant to his own use, is entitled to be subrogated to the rights of the state, and recover from the appellee the $3,-774.70 of that money which consisted of interest paid by it to him on the state's deposits. The general equitable doctrine of subrogation, by which a surety who has paid the debt of his principal becomes entitled to all of the rights of the creditor against the principal debtor and to the benefit of all securities for the debt held by the former against the latter, is universally recognized. We are, however, in this case asked to go a step further, and hold that under such circumstances the right of subrogation is not restricted to the rights and remedies to which the creditor was entitled against the principal, but extends to his rights and remedies against other persons who were liable for the debt which has been satisfied by the surety. We are not aware that this court has ever been called up-

on to pass on that precise proposition, but the expressions which it has used in defining the right of subrogation are broad enough to include the principle upon which the proposition rests."

It would be a fair statement that many of the cases hold that if a third person has been free from negligence and has not participated consciously in the wrong, has had no notice that would put him on his guard, and that the principal was originally liable only because of a harsh rule of law, that in a contest between the third person and the surety the equities of the situation are with him, and therefore there should be no subrogation. We have referred to a number of these cases, but that is the extent we think to which any of them go. Many cases hold that where the original liability has been found to exist it is the end of the controversy and subrogation follows as a matter of course. Some confusion arises from failure to discriminate in some of the cases participation in a breach of trust as the ground of original liability which requires knowledge and participation in an act of conversion which does not require knowledge. In many of the cases the third person was found to have participated in a breach of trust as the only way of premising liability to the original creditor.

The situation presented in some of the cases where the third person is himself an obligee of a surety bond is of course entirely different from that presented here, and the authorities as to that are to the effect that the surety may not have the benefit of that liability, although the statement of Judge Booth in Fidelity & Deposit Co. of Maryland v. Farmers' Bank of Bates County, Mo. (C. C. A.) 44 F.(2d) 11, already quoted, somewhat weakens that doctrine.

Under the doctrine as gathered from the various cases in this circuit we think that if appellants participated in the original wrong of Erskine by which liability on his part to the state was created, or if they were guilty of negligence in entering into and carrying out the arrangement had with him for the purchase of the timber, appellee would be subrogated to the right of the state to recover against them in an action of conversion.

■ Were appellants guilty of negligence, or did they participate in the original wrong of Erskine, which was the transaction of disposing of the timber without paying the state therefor?

Appellants claim that the equities are entirely with them; that they are innocent parties as against the surety's claim; that there

was no bad faith on their part; that they relied on the general practice of the surety settling with the state where the permit holder did not pay for the timber; that the surety company was paid to assume the very obligation which it now seeks to enforce.

We are unable to see that appellants have any particular equities in this situation. It is unfortunate that they may be compelled to pay twice, although the record does not disclose what profit, if any, they received in selling the timber which might materially reduce their loss. If there were no bond they would have to pay the state for the timber which they had wrongfully taken. The application of subrogation therefore does not increase their burden. They are merely paying a different party. They were expressly charged by section 6394 of the General Statutes of 1923 with notice of all information on file in the auditor's office. They could, as said in Cooper, Myers & Co. v. Smith et al., supra, have inquired at that office and would then have known that Erskine had not paid for the timber. Appellants knew the timber was cut from state land and that Erskine had no title thereto unless it was paid for. They bought from one who did not own the timber, and they were charged by the statute with notice of the facts set forth in the records of the auditor. The permit may be assumed to have been on file with the surveyor general, he being under the law charged with reporting the amount of timber cut under any permit to the auditor. The permit could not under the law have contained any provision granting title before the timber was paid for. Appellants gambled on the proposition of payment, probably assuming as suggested in argument of counsel that the surety company would pay the state if Erskine did not. They are not the innocent party spoken of in Northern Trust Co. v. Consolidated Elevator Co., supra. They are in no better position than the purchaser of chattel property from a mortgagor when the mortgage is properly on record. How can it be said they were not negligent. It seems to us their negligence is clear. Further, in purchasing the timber under the circumstances they knowingly, we think, participated in the "joint wrongful" act fully as much as defendants did in Fidelity & Deposit Co. of Maryland v. Farmers' Bank of Bates County, supra. They legally knew what the law charged them with knowing. They therefore knew the facts which made their act wrongful in purchasing the timber from one who had no title thereto. Much is said in argument that the doctrine of constructive notice should not be extended. This has basis in

some of the decisions, but it cannot be successfully contended that the doctrine extends neither to the provisions of the statutes of a state nor to information on file at a state office which a statute of the state specifically says shall constitute notice of the contents thereof. That appellee was paid to carry this liability is true. It may be assumed that in making its agreement to reimburse the state appellee had in mind its right to subrogation. Indeed, the agreements of indemnity refer to subrogation. While the record does not show anything as to rates being made in consideration of the right of subrogation, it is reasonable to believe that the fact of subrogation would affect the rates paid for the indemnity. Appellee paid the liability immediately, and it seems to us the equities of this situation are with appellee. There is no greater hardship on appellants in paying the surety than there would have been to pay the state. They are merely paying their indebtedness. They have received property to which they had no right and in so doing they received some benefit— the payment of advances made to Erskine. In the view we take of this case there is no necessity of discussing the question as to any rights acquired by assignment of the state to appellee of its claim against the principal on the bond.

The judgment of the trial court was right, and it is affirmed.