# C. G. CHRISTENSEN v. ST. JAMES FARMERS GRAIN COMPANY AND ANOTHER.[1]

December 8, 1933.

No. 29,573.

[1]Reported in 251 N. W. 686.

*Van Fossen & Van Fossen,* for appellant.
*Fowler, Carlson, Furber & Johnson,* for respondent.

*LORING, Justice.*

This was an action against the St. James Farmers Grain Company and the Becher-Barrett-Lockerby Company, a commission merchant, for the conversion of grain stored with the grain company and shipped by it to the commission merchant for sale. Plaintiff had verdicts against both defendants, and the Becher-Barrett-Lockerby Company has appealed from an order denying its blended motion for judgment notwithstanding the verdict or a new trial.

The St. James Farmers Grain Company during the fall of 1930 operated a public elevator and grain business at St. James, Minnesota, and, except for certain corn and oats marketed locally, shipped all its grain to the appellant for sale on the Minneapolis market. It appears that the grain company was indebted to the Becher-Barrett-Lockerby Company at the commencement of the 1930 marketing season in the sum of approximately $7,000. The appellant applied the proceeds of the cars shipped to it to this account, thereby converting the indebtedness to a credit of $20.28 on the 12th day of December, when the grain company, having emptied its elevator, ceased shipping. This grain was storage grain covered by storage receipts issued to the farmers who had stored the grain in the grain company's elevator.

The American Surety Company of New York was surety for the grain company as a local public warehouseman. It supplied the funds to the plaintiff to purchase assignments of all of the out-

standing storage receipts, and he agreed to pay the surety company what he recovered in this action upon the assignments. The verdict which he recovered against the appellant was $2,689.65, the stipulated value of all the storage grain sold. The first car covered by the verdict was received by the appellant August 16, 1930, and under that date the appellant acknowledged receipt thereof and referred to a telephone conversation which it had had with the manager of the grain company in which the appellant was advised that the greater part of the car of flax was storage flax, and that the grain company wanted the appellant to hedge against the sale of the stored flax by the purchase of 1,000 bushels of December flax on the market; so it clearly appears at this time and with regard to this car that the appellant was fully advised as to the character of its contents. It was sold on September 9, and on that date appellant bought for the grain company 1,000 bushels of December flax and so advised the grain company. Subsequent hedges covered the cars subsequently shipped under the instructions of the grain company, although we do not find them referred to in the correspondence as cars of stored grain. The storage tickets were in the usual form of negotiable warehouse receipts under 1 Mason Minn. St. 1927, § 5114. The law permits the mingling of such stored grain with other grain of like grade, but does not authorize the sale of the grain by the warehouseman. 1 Mason Minn. St. 1927, § 5163, makes it a crime for a warehouseman to deliver such stored grain out of his possession if he knows a negotiable receipt therefor is outstanding and uncanceled. Notwithstanding this statute, there appears to have grown up a custom in the grain trade to ship such storage grain to the market for sale, and upon a sale thereof the warehouseman protects himself against loss by buying futures upon the grain market. These futures are usually bought at the time the grain is sold through the commission house through which the sale is made. It was the claim of the appellant upon the argument of this case that there is no distinction between the way that storage grain is handled and protected by hedging and that in which purchased grain owned outright by the warehouseman is sold and

hedged against; but the record does not bear out such contention. Sometimes purchased grain which is owned outright by the warehouseman or shipper is protected in transit against fluctuations in price by the sale of futures, but never by the purchase of futures. As far as this record discloses, it is storage grain alone that is protected by hedges through the purchase of futures on the grain market. This is done so that when the warehouseman takes up the outstanding storage tickets he is protected by the hedge against fluctuations in price. He thereby gains storage space in his warehouse and has the use of the purchase price until final settlement. The cross-examination of the appellant's officers showed conclusively that there is no other reasonable explanation for the protection of sales by hedges in this manner. If the sale is thus hedged against, the conclusion is irresistible that the grain is storage grain unless the shipper is engaged in a speculative operation. There is no contention here that there was any attempt at speculation on the part of the grain company or that the appellant thought that the grain company or any of its officers were engaged in speculative operations. The appellant did not knowingly engage in or further speculations of that kind or take any orders for such speculative operations.

It was the theory of the plaintiff that in connection with the transaction of August 16 relative to the first car the appellant learned that the grain company was engaged in this unlawful practice and was put upon inquiry as to the character of the grain involved in all subsequent transactions, and that it is responsible if such inquiry would have disclosed that storage grain was being shipped to it. At plaintiff's request the jury was so instructed and also told that such inquiry should be directed to some officer or director or employe of the grain company other than the manager who had charge of each shipment.

The appellant contends that this charge was equivalent to a directed verdict and that the question of its actual knowledge of the character of the grain should have been left to the jury; that the knowledge that it acquired on August 16, 1930, did not put it

upon inquiry as to subsequent cars shipped to it. It also claims that plaintiff is not the real party in interest.

■ It is admitted by the appellant that if it had actual knowledge that the grain shipped to it was storage grain it would be liable to the holders of the storage tickets for the value of the grain on account of its having sold and disposed of it. It is equally clear that if it had knowledge of facts which should have put it upon inquiry that would have disclosed the character of the grain it is liable to the assignee of such tickets. Northern Tr. Co. v. Consolidated Elev. Co. 142 Minn. 132, 137, 171 N. W. 265, 4 A. L. R. 510.

In the light of the circumstances disclosed by the record and especially the known habit of the trade in regard to hedging against sales of storage grain, we are of the opinion that the trial court was correct in its instruction that by its knowledge of the character of the car received by it on August 16 appellant was put upon inquiry as to the following shipments. The principle has been applied to bank deposits where the bank has been aware of the misappropriation of funds by a trustee. It has been held that where a misappropriation indicated that it was not an isolated incident but one of a system of misappropriations the bank is thereby put upon inquiry as to subsequent withdrawals from trust funds. Such a case is that of Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, 761, L. R. A. 1916F, 1059, where the court held that after a misappropriation from trust funds to the knowledge of the bank, the bank had no longer the right to assume that subsequent withdrawals were proper. The court said [218 N. Y. 113]:

"It had knowledge of such facts as would reasonably cause it to think and believe that Poggenburg was using the moneys of the executor for his individual advantage and purposes. Those facts indicated that the payment to it was not an isolated incident; they indicated, rather, that it was within a method or system. Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion."

In the case at bar it was the custom of the trade to violate the statute prohibiting the sale of storage grain. The coverage by hedging of numerous of the shipments subsequent to August 16 was amply sufficient notice to place upon the appellant the duty of inquiry as to the character of those shipments from the grain company. In all reasonable probability an inquiry would have disclosed the facts. The information seems to have been volunteered by the grain company on August 16. Doubtless a telephone message to Pederson, the manager of the grain company's elevator, would have disclosed the facts. Certainly a request for a statement of grain on hand and the outstanding storage tickets against it would have been reasonable and probably would have been promptly complied with. The inquiry should have been pursued as far as the circumstances might lead a man of reasonable business prudence. The propriety or the necessity of inquiry from officers of the grain company other than Pederson, as charged by the court, is not before us. No inquiry was made, and hence the proper manner of inquiry is not here at issue or raised by the appellant.

It may be that the appellant was not influenced by the fact that the grain company was its debtor in a substantial amount, but on that account it could not well lose by ignoring the indications that the grain was storage grain and by applying the proceeds of the cars to the grain company's account. Whatever knowledge would have been obtained by reasonable inquiry was chargeable to the appellant, and such inquiry would with reasonable certainty have disclosed the storage character of this grain. In view of the custom of the trade and the manner in which hedging was conducted, inquiry was scarcely necessary to acquaint the appellant with the fact that the grain which it was receiving from the grain company was storage grain, shipped and sold in violation of the statute. There was "such a visible state of things as is inconsistent with a perfect right in him who proposes to sell." Northern Tr. Co. v. Consolidated Elev. Co. 142 Minn. 132, 137, 171 N. W. 265, 267, 4 A. L. R. 510; U. S. v. Detroit T. & L. Co. 200 U. S. 321, 333, 26 S. Ct. 282, 50 L. ed. 499. See also Martin v. Federal Surety Co.

(C. C. A.) 58 F. (2d) 79, 89. Even a compensated surety would have been entitled to subrogation as having equity superior to appellant.

■ As assignee and holder of the legal title to the storage tickets, the plaintiff may rightfully recover. The fact that he has promised to pay to the surety company the proceeds of such recovery in no way invalidates the assignment, and the appellant will be protected by the judgment in this case against any claim which might be made by the American Surety Company, which procured the assignments for plaintiff. That disposes of the question of real party in interest. Anderson v. Reardon, 46 Minn. 185, 48 N. W. 777; Jackson v. Sevatson, 79 Minn. 275, 82 N. W. 634.

Order affirmed.

