[Civ. No. 29733. Second Dist., Div. Two. Jan. 25, 1967.]

PACIFIC INDEMNITY COMPANY, Plaintiff and Appellant, v. SECURITY FIRST NATIONAL BANK, Defendant and Respondent.

Anderson, McPharlin & Conners and Robert C. Haase, Jr., for Plaintiff and Appellant.

Voegelin, Barton, Harris & Callister, E. Talbot Callister and Robert A. Smith for Defendant and Respondent.

HERNDON, J. — Plaintiff Pacific Indemnity Company appeals from the judgment denying it any recovery from respondent bank for sums paid by plaintiff under its indemnity contract with Credit Managers Association of Southern California in compensation for losses sustained by Credit Managers by reason of the alleged negligent and unauthorized actions of respondent bank which enabled one Nolan Brown, a Credit Managers employee, to consummate his plan to embezzle his employer's funds. Appellant's complaint sets forth causes of action sounding in negligence and conversion.

Regrettably the relatively simple and determinative issues involved in the instant action were confused and left undecided by reason of the interjection of a legal rule having no controlling application to the problem presented. This error, coupled with the enigmatic nature of the evidence presented to the trial court and the extremely anomalous stipulations entered into by the parties, requires us to remand this cause for further proceedings.

The basic question presented in this action is the following: ''May a bank which has received a check presented to it by an employee of the drawer, and drawn payable to the order of the bank for a specified purpose as indicated upon its face, retain the proceeds thereof after it has credited an equal amount from its own funds to the employee's personal account at his request and has permitted him to make withdrawals therefrom?'' Absent some showing of ostensible authority on the part of the employee, such question, of course, must be answered in the negative. However, the findings of fact and conclusions of law made by the trial court never reached this question because it accepted respondent's contention that the checks in issue were *bearer paper*.

So far as may be gleaned from the terse record before us, one Nolan B. Brown was employed by Credit Managers at all times pertinent to the present action and appellant was surety for Credit Managers upon a standard form of employee fidelity bond. Credit Managers appears to have been engaged in the business of administering the affairs and assets of various businesses which had made assignments to it for the benefit of creditors. In the course of settling the indebtednesses of its clients, by compromise, settlement or otherwise, Credit Managers would issue checks made payable to the order of the various creditors of these clients.[1] In addition, on the face of the checks, in a box provided therefor in the upper left-hand corner, the debtor would be identified and a brief description

---

[1]On this subject the following questions and answers were given by Brown: ''Q. Would you look at each of these and tell me what—explain what this writing on each of the checks means, if you would? A. This is *the name of an account at the Security First* — THE COURT: Would that be a collection account? THE WITNESS: No. It would be an account that was — MR. CALLISTER [attorney for respondent]: Assignment for benefit of Credit — THE WITNESS: Assignment, yes. THE COURT: Would that be the name of the assignor in each case, the person whose affairs are being handled by the Credit Managers Association? THE WITNESS: That's right. THE COURT: Would the assignment be for benefit of creditors? THE WITNESS: Yes, or compromise settlement.''

given designating the particular indebtedness to which the proceeds of the check were to be applied by the named creditor-payee in the event he accepted the tendered payment in full satisfaction thereof.

During the period of 37 days beginning on August 7 and ending on September 12, 1962, Brown caused six checks to be drawn against the account of his employer with the Union Bank. All six checks were made payable to respondent bank. These checks were imprinted with the drawer's name and the signatures of certain of its officers. The amounts had been placed thereon by means of a "check writing machine." *Each of these checks stated on its face in the upper left-hand corner the purpose for which it was purportedly made payable to respondent.*

The first check dated August 7, 1962, in the amount of $575 stated on its face in bold type: "When properly endorsed this check is accepted in full payment of the following items: RE: ROLAND BIRD FOR REIMBURSEMENT OF OVERDRAFTED FUNDS." The check dated August 21, 1962, in the amount of $1,629.53 read: "When properly endorsed this check is accepted in full payment of the following items: RE: P & L TRUCK PAYMENT IN FULL ON CONTRACT." The check dated August 23, 1962, in the amount of $2,874.00 read: "When properly endorsed this check is accepted in full payment of the followin items: RE: P & L TRUCK FOR FINAL PAYOFF ON CONTRACT." The check dated August 28, 1962, in the amount of $8,997.62 read: "When properly endorsed this check is accepted in full payment of the following items: RE: HATFIELD CONSTRUCTION CLAIM PAYMENT IN FULL." The check dated September 7, 1962, in the amount of $5,739.97 read: "When properly endorsed this check is accepted in full payment of the following items: RE: SHIGERU HIRATA FOR FULL PAYMENT OF COND. SALES." The final check dated September 12, 1962, in the amount of $3,263.47 read: "When properly endorsed this check is accepted in full payment of the following items: RE: HERSCHEL LUND FOR FULL PAYOFF OF COND. SALES CONTRACT."

The only evidence introduced by either party tending to establish the office practices and procedures of Credit Managers was that supplied by the testimony of its employee Brown. He was called as a witness by respondent and without amplification testified that his position with the company was that of "Assistant to the Estates Manager." He was not

questioned concerning the nature of his duties or the authority accorded to his position. He answered the following question in the affirmative: "In the course of your duties, were you called on from time to time to make out check orders in the course of your business?" He was then shown certain documents captioned "Check Orders" and asked to describe the procedure he had followed "with respect to those and culminating in the issuance of checks?"

Brown testified: "I made the order out. Then, it was submitted to the Estates Manager [Mr. Moyer] for his signature and initialing. And it was also submitted to Mr. Engelman for his initialing." He further stated that he did not recall whether or not the signatures or initials of Mr. Moyer or Mr. Engleman appearing on the orders were genuine. Subsequently, however, the parties stipulated that these signatures were forged by Brown.

Brown also testified that the persons or businesses whose names appeared on the face of the checks were clients whose affairs were being handled by Credit Managers Association. He testified at one point that these persons' accounts with his employer actually required payments to be made to respondent bank and at another point that "the terminology" used in the notations was "something made up entirely by [him] in order to get the check issued by the Credit Managers Association." He explained that he had caused the checks to be drawn payable to the order of respondent bank rather than to himself because he knew they would not have been issued if they had been made payable to him.

As might be expected of a man who had been the subject of a criminal prosecution for his actions in the premises, Mr. Brown gave accommodating but unenlightening answers to the several ambiguous and conclusional legal questions propounded to him by counsel for both parties. Thus, he admitted that his intention throughout was to defraud his employer but with equal facility he conceded that he did not intend respondent bank to have any interest in the proceeds of the checks issued by his employer. We doubt that Mr. Brown ever seriously considered the question of who would or should ultimately bear the loss resulting from his wrongful acts, but in any event his personal opinion or intention on this legal issue does not aid in its judicial resolution.

No evidence was introduced to establish who within the company actually made out the checks, although apparently it

was not Brown himself, or how Brown came to receive possession of them. No evidence was introduced tending to establish that the protective procedures adopted by Brown's employer were unreasonably lacking in care or failed to conform with business practices generally prevailing or reasonably to be expected of it. In fact, as previously indicated, the record actually fails to establish that the checks involved herein did not constitute proper payments due to respondent bank on behalf of Credit Managers' clients. When questioned on this point during oral argument on this appeal, neither counsel was able to enlighten this court on this question.

However, in whatever fashion Brown had obtained possession of these checks made payable to respondent bank, he took them to respondent's Pico-Alvarado branch where he maintained a personal checking account. This branch was the bank nearest to Credit Managers' offices and was patronized by some 300 of its employees. In addition, respondent bank's employees stated in their depositions which were received in evidence that Credit Managers itself maintained an account with respondent bank in another of its branches and that certain of its employees frequently made ''inter-branch'' deposits on its behalf at the Pico-Alvarado branch. Also, by way of affirmative defense, respondent alleged that *''Said [Credit Managers] Association had done and was doing a large volume of business with this defendant at other of its branches without untoward incident, and this defendant and its agents and employees were therefore desirous of giving said Association the best service possible.''* (Italics added.)

Nevertheless, despite this allegation and the fact that all the evidence presented was to the contrary, the parties entered into a stipulation which the trial court included as a finding of fact that ''there was no business relationship of any kind or nature existing between Credit Managers Association of Southern California and . . . [Security First National Bank], and there was no indebtedness owed to . . . [Security First National Bank] by said Credit Managers Association of Southern California.'' One might surmise that the parties intended by this remarkable stipulation to indicate only that Credit Managers did not maintain an account at the *Pico-Alvarado branch* of respondent bank and that Credit Managers *itself* was not indebted to it for any of the items reflected by the checks here in issue. On the other hand, it is possible that the parties intended to agree that this case might

be tried *as if* their relationship was that indicated by a literal reading of the stipulation although such fact was actually untrue. Of course, the stipulation does not expressly touch upon the question of whether Credit Managers' clients were indebted to respondent for any of the items indicated on the checks. It would be pointless for us to speculate on this paradoxical problem, however, since its resolution may properly be left to the parties and the trial court upon the retrial required herein.

The depositions of three of respondent bank's tellers were introduced into evidence. One Barbara Wade testified that she had accepted four of the six checks here in issue. She stated that when she checked on Brown's account "He was a little bit fidgety. That is how I remember that. He was awfully scared. Not scared but fidgety." Concerning the first of the checks for which Brown had sought and obtained an immediate cash payment in addition to receiving a credit to his personal account for the balance, Miss Wade gave the following testimony:

"Q. All right. Would you tell what you remember surrounding his presentment of this check to you? A. Mr. Brown came to my teller window. I noticed he wanted less cash from his deposit. It was for over $100 so I asked him to sign his name by the cash received stamp on the deposit ticket. He did so. I checked his ledger. I checked his signature card for proper identification. I saw on the signature card that he was employed by Credit Managers. I believe I did ask him to sign the back [of the check] made out to Security First National Bank and he made an excuse but I don't recall why I didn't bring it to the manager's attention." She also did not remember what "excuse" he had given her by way of explaining his unwillingness "to sign" the check.[2]

Miss Wade and the other two tellers admitted that they knew that they should not have accepted unsigned checks for deposit and had done so without any knowledge of Brown's position with Credit Managers and without making any

___

[2]Of course, respondent's failure to obtain Brown's signature on the checks did not affect its title thereto, e.g., Brown was not the payee named therein and therefore his signature would have been legally irrelevant to respondent's own right to endorse the checks and receive the proceeds thereof. However, his refusal to sign the checks in accordance with respondent's rules was a fact bearing upon the reasonableness of respondent's actions in connection with these checks and the application of their proceeds.

inquiry as to his authority to direct the disposition of the proceeds of the checks made out to their employer. Apparently they also ignored the directions contained upon the face of the check since in the usual case where the bank is not the payee it would be of no concern to it why the drawer of a check was making payment to some third party payee. Each teller also testified that in handling these checks he had violated another rule of the bank that almost certainly would have disclosed Brown's illegal activities immediately following his presentment of the first check. Miss Wade gave the following testimony concerning this rule :

"If it's just a deposited check [rather than a 'less cash check'], I take it and I enter it in their book. Put the large item—in the large item bin to be picked up for the supervisor. I am sorry, the manager to approve. Q. What do you mean the 'large item bin?' A. Any transaction of $500 or more is placed on a separate shelf in a box on the teller's window. Q. It requires the manager's approval? A. That is right. I don't always pay attention to who they are made out to because sometimes you have several checks to look at and you couldn't possibly take the time to look at every single payee but I don't recall that particular instance.[3] Q. Well, now, when is the manager's approval secured, at the time or some— A. No it's another time. That is why it's put in a separate bin. Q. What other time would it be; the same day? A. The same day, definitely. Q. Within an hour? A. Most of the time. It just depends."

None of the three tellers had placed the instant checks into the "large item bin" and therefore none of them was approved by respondent bank's manager although they all exceeded the $500 minimum and one was in the approximate amount of $9,000. It was stipulated, however, that none of the tellers had *actual* knowledge that Brown was attempting to perpetrate a fraud upon anyone at the time they handled these transactions.

Some time during October 1962, Credit Managers learned of Brown's actions and was able to recover $15,460.07 from him. Subsequently appellant paid Credit Managers $7,619.52 under its indemnity policy and thereafter instituted the present action seeking to recover this amount from respondent bank. The record further indicates that after appellant "took

---

[3] The deposit slips in the instant case indicate that only one check was deposited by Brown on each occasion.

over'' the matter it ''realized'' an additional $2,299.88 from the sale of certain personal property owned by Brown but a dispute exists between the parties as to how this sum should be applied. In view of the trial court's judgment herein no finding was made on this subsidiary issue and the record is so indefinite on the subject that we would not be warranted in expressing an opinion thereon.

On the basis of the foregoing evidence the trial court made findings of fact. Most of the crucial findings contain unauthorized legal conclusions or assumptions not supported by the record. Thus, the court found that during his employment ''Nolan B. Brown embezzled and misappropriated funds from his employer *by causing certain checks to be issued* which were drawn on the account of Credit Managers Association of Southern California and made payable to defendant. Said Nolan B. Brown deposited the proceeds thereof to his personal account which said Nolan B. Brown maintained with defendant.'' (Italics added.)

Such finding clearly is inaccurate and misleading. Brown did not embezzle or misappropriate any of his employer's funds when he caused the checks to be issued. The issuance of the checks was merely the first step in his fraudulent scheme. No loss to Brown's employer occurred, or could have occurred, until respondent bank received the checks made payable to its order and, so far as revealed by the record, without any reason whatsoever to believe Brown was authorized to receive payment thereof, accepted these checks without inquiry and contrary to its established rules, and credited or paid over to Brown the amounts indicated thereon. The successful consummation of Brown's embezzlement was entirely dependent upon the conduct of respondent. Brown's position, *inter se* his employer, would have been the same even if the checks had been entirely valid and proper instruments designed to pay indebtednesses to respondent by reason of the transaction indicated on their face. Similarly his relationship with his employer would have been the same if he had stolen these checks and imprinted the amounts thereon in the dead of night. In no event could his employer have suffered a loss until respondent received these checks from Brown and placed its own funds at his disposal merely because he had physical possession of them.

The court also found that ''At the time of [Brown's] so furnishing the name of defendant as payee, and

in having said checks so issued, and at all times pertinent herein, Nolan B. Brown did not intend that said payee should have any interest in said checks or in the proceeds thereof, or in any part of said proceeds, and such fact was known at all of said times to said Nolan B. Brown.''

Apparently this inaccurate finding was made in order to establish a basis for the conclusion of law subsequently made that these checks were ''bearer paper'' as defined by former Civil Code section 3090. This section was repealed by Statutes 1963, chapter 819, section 2, effective January 1, 1965, but governed the events here in issue. It provided:

''The instrument is payable to bearer—(1) When it is expressed to be so payable; or (2) When it is payable to a person named therein or bearer; or (3) *When it is payable to the order of a fictitious or nonexisting or living person not intended to have any interest in it and such fact was known to the person making it so payable or known to his employee or other agent who supplies the name of such payee*; or (4) When the name of the payee does not purport to be the name of any person; or (5) When the only or last indorsement is an indorsement in blank.'' (Italics added.)

Of course, today, under the terms of Commercial Code sections 3111 and 3405, respondent's basic contention in this case would not have even the superficial appearance of plausibility. The reason for the terminology changes found in these sections is set forth as follows in the Official Comments on Uniform Commercial Code appearing in the annotations to California Commercial Code section 3405:

''1. This section enlarges the original subsection to include additional situations which it has not been held to cover. *The words 'fictitious or nonexisting person' have been eliminated as misleading, since the existence or nonexistence of the named payee is not decisive and is important only as it may bear on the intent that he shall have no interest in the instrument. The instrument is not made payable to bearer* and indorsements are still necessary to negotiation. The section however recognizes as effective indorsement of the types of paper covered no matter by whom made. *This solution is thought preferable to making such instruments bearer paper; on the face of things they are payable to order and a subsequent taker should require what purports to be a regular chain of indorsements.* On the other hand it is thought to be unduly restrictive to require that the actual indorsement be

made by the impostor or other fraudulent actor. In most cases the person whose fraud procured the instrument to be issued will himself indorse; when some other third person indorses it will most probably be a case of theft or a second independent fraud superimposed upon the original fraud. In neither case does there seem to be sufficient reason to reverse the rule of the section. *To recapitulate: the instrument does not become bearer paper*, a purportedly regular chain in indorsements is required, but any person—first thief, second impostor or third murderer—can effectively indorse in the name of the payee. . . . 5. The section is not intended to affect criminal liability for forgery or any other crime, *or civil liability to the drawer* or to any other person.'' (Italics added.)

However, even under the definitions set forth in former section 3090, the transactions involved in the instant action were not subject to resolution by the application of the principles enunciated therein. Numerous cases discussing the historical background and legislative purpose underlying former section 3090, or substantially identical statutes enacted in other jurisdictions, have been collected and analyzed in numerous texts. (Cf. 3 Hastings L.J. 58; 25 Cal.L.Rev. 616; 23 Cal.L.Rev. 523; 18 Cal.L.Rev. 693; 17 So.Cal.L.Rev. 70; 13 So.Cal.L.Rev. 112; 10 So.Cal.L.Rev. 524; 9 So.Cal.L.Rev. 397; 6 So.Cal.L.Rev. 67; 37 State Bar J. 157; 2 Yale L.J. 417; 81 A.L.R.2d 1365; 87 A.L.R.2d 638; 118 A.L.R. 15, 38; 99 A.L.R. 439; 74 A.L.R. 822.) Inevitably the theories and considerations discussed and applied in this myriad of cases are not always entirely harmonious because of the varying factual contexts to which they were directed. However, certain basic rules are consistently developed by these authorities.

Initially, of course, the entire problem arises because of the heavy burden placed upon depository banks by their contractual agreement not to pay out their depositor's funds except in strict accordance with his instructions. ▉ Where a depositor issues a check instructing the drawee bank to make a payment from his funds on deposit to a specified person, his account may not be charged for this amount unless this person actually endorses and negotiates this check. In practice, of course, where the check is not physically presented to the drawee bank by the named payee, the drawee bank has no practical way of determining the validity of the endorsement that has been placed thereon. Nevertheless, if the endorsement is forged, the drawee bank may not charge it to the drawer's

account. Of course, the drawee bank does have a right of recovery against a collecting bank either in quasi contract for money paid out by mistake or on the written guaranty of prior endorsements usually stamped on the checks by collecting banks. The collecting bank also has right of recovery against its depositor who presented it with the check and so on back down the line until the loss, in theory, falls upon the party who first accepted the forged instrument. This party must then seek recovery from the party who defrauded him.

Certain common sense rules based upon the doctrine of estoppel were gradually created to lighten this burden of the depository and collecting banks. Typical of these rules were those dealing with situations created by the drawer that effectively eliminated the possibility of a valid endorsement ever being placed on the check. For example, if the drawer of a check made it payable to the order of a nonexistent person or a real person to whom it was never to be delivered, then no endorsement other than a ''forged'' endorsement could ever be placed thereon and under such circumstances the drawer would not be heard to complain that his account had been charged in a manner contrary to his instructions when such an instrument found its way into the hands of the drawee bank. A similar result was reached when the drawer handed the check to an impostor for when the impostor cashed the check and the proceeds were placed in his hands, the drawee bank had actually delivered them to the *person* to whom the drawer had directed payment to be made although the drawer had been mistaken as to that person's true identity.

It is to be noted that in each of these instances the issue was not whether the named payee was or was not intended to have an interest in the proceeds of the check, but whether such a person was ever intended to receive *the check itself* and to place an endorsement thereon. In the case of the real or fictitious payee who was never intended to receive the instrument, it was clear that the drawer never intended it to pass by valid endorsement and hence it came to be classified as bearer paper. Subsequently questions arose as to whose intent was to be considered in determining whether or not the designated payee was a person who was intended to place a valid endorsement thereon. In the case of employer-employees, California adopted the rule that the employee's intent would govern if he were responsible for supplying the name of such payee. (Stats. 1945, ch. 658, § 1, p. 1315.)

However, the resolution of this question did not alter the basic rules regarding "bearer paper" and certainly there was never any intent to extend the applicability of these rules to the named payee himself. It never was intended that the application of Civil Code section 3090 would depend upon the named payee's having an interest in the "proceeds" of the instrument. The question is whether he was to have an opportunity to endorse the instrument itself. That is to say, if the drawer made the check payable to P and instructed P to cash the check and deliver the proceeds to the drawer, the rule enunciated in former section 3090 never was applicable although P obviously was not intended to have an interest in the proceeds of the check. If P misappropriated the proceeds of the check, the drawer had no cause for complaint against the drawee bank, or any precedent party, because he intended that P would endorse the check and he had done so. Similarly, when the drawer sought recovery from P for misappropriating the proceeds of the check, P was in no position to contend that the check was "bearer paper" and therefore he could do with the proceeds as he wished. An essentially identical picture is presented in the instant case since Credit Managers had no basis for complaint against the drawee Union Bank when it paid over its funds to respondent, the named payee whose valid endorsement appeared on each check.

Ordinarily, of course, when one speaks of "an interest" in a negotiable instrument, a deed, or other document of title, he would have reference to the property described in, or to be transferred by, the instrument rather than to the instrument itself. Therefore, unless the purpose underlying section 3090 is carefully borne in mind, i.e., to provide a working rule for allocating the losses resulting from "forged" endorsements in instances where the drawer created a condition in which a valid endorsement was impossible, it is a natural error to misconstrue the otherwise clear language found in this section. Section 3090 provides in pertinent part: "The instrument is payable to bearer . . . when it is payable to the order of . . . a living person not intended to have any interest in *it* . . ." The "it" referred to is obviously "the instrument" yet if the function of the section is overlooked, there is a tendency to apply the section as if it read: "The instrument is payable to bearer . . . when it is payable to the order of . . . a living person not intended to have any interest [*in the proceeds*] in it . . ."

Such error seems to have occurred in the case relied upon by respondent in support of the judgment entered herein. In *Fidelity & Casualty Co.* v. *United States Fid. & Guar. Co.* (La. App.), 81 So.2d 576, a trusted 20-year employee was known by the drawee bank to be in charge of deposits and withdrawals from his employer's accounts. Over ''a considerable number of years'' this employee had prepared and written checks bearing his employer's machine-affixed facsimile signature and drawn in favor of the drawee bank. He then cashed these checks at the drawee bank, sometimes signing his name on the back thereof and sometimes not. When in 1952 the employer discovered his employee's misconduct, he conducted ''a complete and detailed audit of his affairs back through a period of some years'' and thereafter sought to recover from the drawee bank the amounts it had paid out on some 48 checks dated between January 8, 1946, and July 22, 1948, totaling only $1,734.60. The trial court denied the employer recovery, apparently in part, at least, on the clearly valid grounds of ostensible authority and estoppel.

Upon appeal, however, the judgment was affirmed upon what we regard as a clear misreading of a Louisiana statute identical to former section 3090 of the California Civil Code. The court stated at page 578: ''There is not the slightest contention that the bank named as payee was intended to have any interest *in the amounts* represented by the checks and, indeed, it was testified by all parties as a matter of cold fact that the bank did not have any interest, nor did there exist any basis for an interest or a claim thereof.'' (Italics added.) From this fact the court determined, without analysis, that the checks were ''bearer paper'' and concluded that such determination disposed of the issues presented.

We are unable to accept this approach although we agree with the result achieved. There doubtless are many instances where the named payee of a check delivered to him will become the holder in due course thereof although he is in no way entitled to the proceeds thereof until he has cashed it for another who has apparent authority to deal with the instrument.[4] Several such examples are given in the Official Comments on Uniform Commercial Code section 3302, subdivision (2):

[4]Cf. *Union Bank & Trust Co.* v. *Security-First Nat. Bank*, 8 Cal.2d 303, 305, 310-311 [65 P.2d 355], wherein the faithless employee presented his employer's properly executed check to the drawee bank which

". . . The position here taken is that the payee may become a holder in due course to the same extent and under the same circumstances as any other holder. This is true whether he takes the instrument by purchase from a third person or directly from the obligor. All that is necessary is that the payee meet the requirements of this section. In the following cases, among others, the payee is a holder in due course: . . . c. A and B sign a note as comakers. A induces B to sign by fraud, and without authority from B delivers the note to P, who takes it for value, in good faith and without notice. d. A defrauds the maker into signing an instrument payable to P. P pays A for it in good faith and without notice, and the maker delivers the instrument directly to P. e. D draws a check payable to P and gives it to his agent to be delivered to P in payment of D's debt. The agent delivers it to P, who takes it in good faith and without notice in payment of the agent's debt to P. But as to this case see Section 3-304(2), which may apply.[5] . . . g. D draws a check blank as to the name of the payee, and gives it to his agent to be filled in with the name of A and delivered to A. The agent fills in the name

was named as the payee therein *together with a written requisition authorizing him to use the proceeds of his employer's checks to purchase the bank's cashier's checks drawn payable to payees designated by him.* The employee never delivered the cashier's checks to the parties named therein but "forged" their signatures and retained the proceeds. The court not only held that the cashier's checks fell within the standard bearer paper rule but that the drawee bank had acted entirely as a volunteer in reimbursing the employer for its losses since it had "followed the [employer's] instructions implicitly." Such a factual picture is essentially the opposite of that presented in the instant case. The court in *Union Bank & Trust Co.* v. *Security-First Nat. Bank, supra,* p. 304, simply reaffirmed the basic theory underlying the bearer paper rule in the following apposite language:

"[T]he rule discussed which converts what on its face appears to be negotiable instruments payable to a designated person into 'bearer paper' *is a limitation upon the liability of depositories* because otherwise, those who put checks and drafts into circulation would have it in their power by collusive understandings incapable of proof to conduct illegitimate transactions and hold the depository liable upon proof of the *forgery of the name of a payee* never intended in fact to be a payee. An extended discussion of the case is not necessary by reason of the exhaustive opinion in the *Goodyear* case (*Goodyear Tire & Rubber Co.* v. *Wells Fargo Bank etc. Co.,* 1 Cal.App.2d 694 [37 P.(2d) 483]) . . ." (Italics added.)

[5]Section 3304, subdivision (2) provides: "The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt *or in any transaction for his own benefit* or otherwise in breach of duty." (Italics added.)

of P, and P takes the check in good faith, for value and without notice.''

In each of these examples, of course, the issues determinative of the named payee's rights will be decided by application of the ordinary rules of agency, estoppel, etc. rather than by erroneously denominating the instrument as ''bearer paper'' and this was as true prior to the enactment in California of the Uniform Commercial Code as it is today.[6]

As we have been at pains to point out, former section 3090 has no application in the instant case in which endorsements by the named payee, ''forged'' or otherwise, are not involved. Contrary to the finding made herein by the trial court, the respondent bank, the named payee of the checks, not only had ''an interest in *it* [each check]'' but in fact they were actually delivered to respondent who endorsed them and received the proceeds thereof from the drawee bank. As previously indicated, the question here presented is whether the named payee has a right to retain the proceeds of these checks by reason of its having advanced its own funds to Brown. The checks may or may not have been issued as instruments to be used in the payment of fictitious debts, but the payee named therein certainly was a real entity and did receive the checks and validly endorsed them. The issue presented by its conduct is therefore not resolvable by reference to former section 3090 but rather by determining whether, under the circumstances, respondent should be protected from loss after it had credited Brown's personal account with the amounts of the check, contrary to the instructions contained on the face of the checks themselves, and permitted him to make withdrawals therefrom.

The various cases cited by respondent (cf. *California Mill Supply Corp.* v. *Bank of America,* 36 Cal.2d 334 [223 P.2d 849], and cases cited therein) in support of its argument deal with the typical ''padded payroll'' case where an employee causes a check to be issued payable to a real or fictitious person to whom *the check is never to be delivered.* In these

---

[6]As stated in the Final Report of the Subcommittee on article 3 of the Uniform Commercial Code: ''Article 3 of the Uniform Commercial Code is a revision and reorganization of the existing Uniform Negotiable Instruments Law now found in our Civil Code. While new language has been used, the changes from the existing NIL are not too great and to all intents and purposes it may be said that the law in this area remains the same.'' (Sixth Progress Report to the Legislature by Senate Fact Finding Committee on Judiciary (1959-1961) Part I, the Uniform Commercial Code, pp. 342-343.)

instances the employee keeps the check himself and ''forges'' the endorsement required. The consequences of this type of transaction, as regards future holders of such checks, including drawee or collecting banks, is still the same under subdivision 1(c) of section 3405 of the Commercial Code.

In such instances '' [t]he principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent *such forgeries* by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.'' (Official Comments on Uniform Commercial Code section 3405 set forth in the annotations to California Commercial Code section 3405.)

However, neither present Commercial Code section 3405 nor former Civil Code section 3090 ever was designed to protect the *payee* named therein if the check was in fact delivered to him and he received the sums specified therein under circumstances which neither entitled him to retain such funds nor to divert them to some other person. This is particularly true in cases involving payee banks where the following rules were well established:

''It is generally held that a check or draft drawn to the order of a bank precludes the diversion of the proceeds of it to a use other than that of the drawer, and that such diversion can be justified only by proof of authority from the drawer. It is held to be immaterial that the drawer may have been negligent in signing the check, and inquiry will not protect the bank where it is made only of the person tendering the check. Thus it appears that a drawee bank which is also the payee is liable to the drawer for paying the check to a third person or to the drawer's agent who has no actual or apparent authority from the drawer to collect its proceeds, or for diverting its proceeds to uses other than those of the drawer, without specific instruction from the drawer to that effect; but that if the drawer has clothed his agent with apparent authority to receive the proceeds of such check, the bank is not negligent in, and is not liable to the drawer for, paying, in reliance upon such apparent authority, the proceeds of such check to such agent, or appropriating them to

uses directed by the agent contrary to his actual authority, if the agent should misappropriate such proceeds.'' (10 Am. Jur.2d, Banks, § 560, pp. 529-530.)

■ ''Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment.'' (9 C.J.S., Banks and Banking, § 340, p. 683.)

■ The trial court also made the following finding: ''At the time of accepting each and all of said checks for deposit in Nolan B. Brown's personal account, defendant, its agents and employees, acted innocently and in good faith and had no knowledge of any infirmity in any of said checks or *of any defect in title of said Nolan B. Brown.* At all times in accepting each and all of said checks for such deposit, defendant, its agents and employees, owed no duty to Credit Managers Association of Southern California, or plaintiff, to investigate the purpose for which said checks were issued, or *to obtain endorsements thereto,* or *to verify the authority of said Nolan B. Brown to negotiate or deposit the same.*'' (Italics added.)

Insofar as this ''finding of fact'' refers to the innocence and good faith of respondent's employees, it is apparently derived from the stipulation of the parties that the employees had no *actual* knowledge that Brown was attempting to embezzle funds from his employer or from respondent. The patent defect in the finding, however, is that indicated by the italicized portion. That is to say, apart from his naked possession of these checks made payable to respondent, there was no evidence indicating that Brown had any title, defective or otherwise, in the checks or the proceeds thereof. Certainly he was legally incapable of ''endorsing'' them since they were not payable to his order. (Civ. Code, § 3111.)

In addition, the testimony of respondent's employees indicates that they knew nothing of Brown's position with Credit Managers. They testified that they never had cashed such checks for Brown previously and further, to the best of their recollections, they never had handled such checks for anyone before. Therefore, the issue was not whether or not a duty existed to ''*verify*'' Brown's ''*authority*'' to direct payment of these checks contrary to the notations appearing upon the face of the instruments but whether or not respondent's em-

ployees acted reasonably in assuming Brown had any authority whatsoever in the premises. That is to say, before any question of *verification* of authority can arise there must, at least, be some *appearance of authority* which then may or may not require verification. In the instant case, the record is wholly devoid of any such evidence unless it can be said as a matter of law that every employee of unknown rank who comes into possession of a check made payable to others for specified purposes has the *apparent authority* to receive and appropriate the proceeds thereof to his own personal benefit.

The trial court also found that the issuance of these checks "was the direct and proximate result of the failure of said Credit Managers Association of Southern California, in its office procedures and practices, to take reasonable precaution to safeguard its moneys and property and to insure against the issuance of unauthorized checks." As previously indicated, the evidence relating to Credit Managers' "office procedures and practices" was extremely limited and no evidence whatsoever was presented even hinting at what "reasonable precautions" might have been taken that would have prevented the issuance of these checks assuming that the debts specified on their face were fictitious or, at least, not owing to respondent. As Brown himself testified, the checks would not have been issued if they had appeared in any way to have authorized him to receive the proceeds. We cannot hold that it is unreasonable as a matter of law for an employer to rely on the fact that if a check is drawn to the order of a large banking institution, with notations on its face as to its purpose, the proceeds of this check will not be handed over to an employee with no apparent authority to receive them.

Finally, the issue of the safeguards taken by Brown's employer to guard against the issuance of unauthorized checks is basically irrelevant in the present case for even if the checks in fact had been authorized payments to respondent for the purposes indicated thereon, the conduct of respondent's tellers would have permitted Brown to consummate his fraudulent plan in exactly the same fashion as he did in the instant case.

For the same reasons the trial court's finding that Credit Managers was "negligent in its office practices and procedures and *such negligence was the proximate cause of the embezzlement and misappropriation of funds by Nolan B. Brown*" is not supported by the evidence. Even if we were to

accept the proposition that whenever an employee of unspecified position with a company is able to cause a check to be issued to a third person in payment of a nonexistent debt, such circumstance alone is sufficient to sustain a finding of negligence on the part of the employer, such negligence would not have been the proximate cause of the embezzlement that occurred in the instant case.

Finally, the trial court found that respondent was innocent of any wrongdoing in the instant case and as between respondent and Credit Managers the latter was the least innocent since it had "placed Nolan B. Brown, by virtue of his employment, in a position where he was able to perpetrate the embezzlement hereinbefore described." For these reasons the court further found as a fact that appellant was not entitled to enforce its right of subrogation and that neither appellant nor Credit Managers was entitled to maintain any action against respondent. These latter "findings," of course, are conclusions of law invoking the rule set forth in *Meyers* v. *Bank of America,* 11 Cal.2d 92 [77 P.2d 1084].

The *Meyers* case bears little, if any, factual resemblance to the instant proceeding. In *Meyers* an office manager had forged his employer's name to certain checks made payable to the employer. These checks were then negotiated for full value to one Wascher who deposited them in the ordinary course of his business with appellant Bank of America which thereafter presented them to the respective drawees and received full payment therefor. The employer's bonding company paid the employer for its losses and then sought to enforce its subrogation rights against the bank. Under these facts, the court in *Meyers* held (pp. 102-103) :

"As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. *It must be conceded that the bank is an innocent third party,* whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor *nor the bank was the wrongdoer,* but by independent contract obligation each was liable to the employer. In equity, it cannot be

said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. *The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits.* The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the 'loss.'' (Italics added.)

In the instant case, of course, Brown's forgery of the check orders was not the primary cause of the loss herein and respondent's employees admittedly violated several rules of ordinary banking practice, any one of which would have prevented the successful consummation of Brown's fraudulent scheme. Furthermore, from the mere fact that an employee may gain possession of a check payable to a third person indicating on its face the purpose for which it was issued, it could not reasonably be concluded that the employer impliedly had vouched for his employee's integrity in such fashion as to give the employee any apparent authority to divert the proceeds of the check into his personal account contrary to the face of the instrument.

 Although factually dissimilar, the following statement of the court in *Barclay Kitchen, Inc.* v. *California Bank,* 208 Cal.App.2d 347, 356-357 [25 Cal.Rptr. 383] (hearing denied), is equally apposite to our present case:

''As a final point Bank argues that as between Bank and Surety, Surety should bear the loss; that the right of subrogation does not exist in favor of a surety on a fidelity bond except against persons who participated in the wrongful act of the principal.

''But in the present case, unlike the cases cited by Bank, Bank is not an innocent third party. In *Meyers* v. *Bank of America,* 11 Cal.2d 92 [77 P.2d 1084], the court held the surety liable as against the bank where the bank, not being a wrongdoer, paid money in the ordinary course of its business upon checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. *Here, Bank was not innocent. Its negligence made possible the consummation of Mrs. Gianopulus' fraudulent scheme. Its employees admittedly departed from the 'ordinary course' of their banking*

*business.* They should have been alert to Mrs. Gianopulus' misrepresentation of authority.

"Bank argues that subrogation also was not allowed in *Liberty Mutual Ins. Co.* v. *Kleinman,* 149 Cal.App.2d 404, 407 [308 P.2d 347], but there it is expressly pointed out that the third person's conduct was not considered negligent.

"Under the circumstances here the court properly subrogated Surety to the rights of Barclay." (Italics added.) (Also see *Hartford Acc. & Indem. Co.* v. *Bank of America,* 220 Cal.App.2d 545, 562 [34 Cal.Rptr. 23].)

On the basis of the foregoing "findings of fact" the trial court drew the following conclusions of law: "Each and all of the checks described in the complaint were bearer instruments and were negotiable by mere delivery without endorsement. Defendant was a holder in due course with respect to each and all of said checks and by virtue *of the negotiation thereof* to defendant from Nolan B. Brown defendant acquired a good and valid title to each and all of said checks and to the proceeds thereof. Defendant was not negligent in the handling of each or any of the transactions concerned with said checks and defendant did not convert any funds of plaintiff or Credit Managers Association of Southern California." (Italics added.)

Since the evidence so clearly reflects the negligence of respondent's tellers in violating the rules of care established by it (*Hartford Acc. & Indem. Co.* v. *Bank of America, supra,* 220 Cal.App.2d 545, 561, and cases cited), particularly with regard to the placement of these checks in the "large item bin" where they would have come to the immediate attention of the bank's manager, and the complete failure of the respondent to make inquiry of Brown concerning his authority to divert the proceeds of these checks to his personal account, it is apparent that the court's conclusion concerning respondent's lack of negligence is based solely upon its preceding erroneous conclusion that these checks were "bearer" instruments.

Thus, respondent in its brief cites *Industrial Loan Corp.* v. *Wyoming National Bank,* 79 Pa. D. & C. 27 [41 Luz.Leg.Reg. 456], a typical "fictitious payee" case where an employee having power to sign checks on his employer's account drew a check payable to the order of the Craftmen's Club, then endorsed it himself and cashed it with the defendant bank. In an action based upon negligence the court properly deter-

mined this check was a bearer instrument under the provisions of the original Negotiable Instruments Act and then stated: "If, therefore, defendant's duty was to pay to the bearer, and it did in fact pay to the bearer, it is difficult to see how it can be charged with failure to perform its duty. There is no allegation that defendant had actual notice of [the employee's] faithlessness to his employer, nor can we say that the circumstances surrounding the cashing of the check were sufficient to charge defendant with bad faith. The bank might have been more careful perhaps, but carelessness is not sufficient to saddle it with the burden of making good [the employee's] misdeeds."

As previously indicated, however, the instant case is not one involving bearer paper and the *Industrial Loan Corp.* v. *Wyoming National Bank, supra,* case would be comparable to our own only if the employee in that case had taken the check to the Craftmen's Club and it had paid over the proceeds to him personally despite notations on its face indicating a contrary intention on the part of his employer or if Brown had forged respondent's endorsement and then cashed it at another bank.

Similarly, it is clear that the trial court's conclusion in the instant case that respondent was a holder in due course by virtue of *Brown's "negotiation" of the checks* to it is based solely upon the prior erroneous conclusion that the checks were bearer instruments. Former section 3111 of the Civil Code in effect at the time of the instant transactions provided: "An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer it is negotiated by delivery; if payable to order it is negotiated by the indorsement of the holder completed by delivery."

Of course, this is not to say that even prior to the enactment of Commercial Code section 3302, subdivision (2) a payee could not acquire the status of a holder in due course. (*Flores* v. *Woodspecialties, Inc.,* 138 Cal.App.2d 763, 771 [292 P.2d 626].) Cf., however, *Seaboard Finance Co.* v. *Miles & Sons, Inc.,* 102 Cal.App.2d 526, 528 [227 P.2d 892].) However, it is clear that the instant case was not tried upon this theory. As previously indicated there was no evidence presented sufficient to support a finding that by reason of the prior conduct of the parties respondent bank relied, or could have relied, upon any ostensible authority in Brown to direct

that the proceeds of checks drawn by his employer in favor of respondent should be applied to his own personal account.

In addition, ''It appears obvious that a purchaser of a negotiable instrument takes it with notice of all the facts recited on its face.'' (8 Cal.Jur.2d, Bills and Notes, § 84, p. 409.) Here, the notations on the face of the checks belied any right Brown might have asserted as to the proceeds of these instruments. As indicated, such notations might be irrelevant to an endorsee taking from the named payee, or to a collecting or drawee bank receiving a check endorsed by the named payee, but they were certainly of significance to the named payee.

We also have the testimony of one of respondent's tellers that when Brown presented the check ''he was awfully scared. Not scared but fidgety,'' and that when he was asked to sign the check in accordance with the bank's rules he declined to do so. Nevertheless these checks were accepted by the tellers who thereafter violated the further rule of the respondent that would immediately have brought these large checks to the attention of the manager. Any inquiry by respondent's manager would have surely frustrated Brown's plans and prevented any loss to itself, to his employee or to appellant. One whose ignorance and blindness is the direct result of its failure to adhere to its own rules ordinarily will not be heard to urge these self-imposed handicaps as evidence of its innocence. As we stated in *Hartford Acc. & Indem. Co.* v. *Bank of America, supra,* 220 Cal.App.2d 545, 562:

''But it is really inconsequential whether the bank's disregard for existing custom amounted to negligence, for the insurer being faultless the bank had constructive notice of facts which should have prompted action on its part, inquiries which if made doubtless would have frustrated Aitken's plan and thus prevented any loss to itself or plaintiff Hartford. Having such notice and failing to act upon it facilitated Aitken's fraud and placed the bank in a position of fault which, compared with the innocent status of Hartford, dictates the conclusion that Hartford's equity is superior to that of the bank and as between them the latter should bear the loss.

''The fact that plaintiff Hartford was a compensated 'surety' cannot swing the balance of the equities in favor of the defendant bank; although that is a fact to be considered, it is no more than that; and here it loses significance because the

bank itself was compensated for its services through the use of its depositors' money.''

In addition, it may be noted that innocent employers through paying the necessarily increased premiums for indemnity insurance ultimately bear the cost of losses caused by the misconduct of others if their sureties are denied subrogation of their rights against such third persons.

The judgment is reversed.

FLEMING, J.—I concur. In my view a check payable to the order of a named bank is not payable to bearer, and a bank which receives such a check is bound to exercise customary vigilance in determining who is entitled to its proceeds before disbursing them. The claim that a check payable to a named bank is bearer paper is to my mind highly dangerous to all banking-by-mail transactions in which payments are made to a named bank for a particular purpose. If checks payable to a named bank were to be considered bearer paper, logic would indicate that any custodian, finder, or thief could cash them.

The presentation of a check payable to bank is followed by two closely-related but essentially unconnected happenings: (1) the receipt by the bank of the credit, and (2) the paying out or allocation by the bank of that credit to a particular account. In taking money IN the bank need exercise very little caution or formality. Indeed the widespread existence of night depositories is illustrative of this fact. But in paying money OUT the bank is required to exercise all the caution demanded of it as the custodian of other people's money.

In the present case Brown forged instruments under which he was able to put moneys IN a particular bank. The bank acted properly in receiving the moneys, and in this phase of the matter no harm was done. But in the second aspect of the transaction—paying moneys OUT or crediting an account from which moneys could be withdrawn—the bank failed to take any steps to determine where the credits derived from the checks properly belonged. If this determination were a matter of some difficulty which could not readily be solved, the bank should have temporarily placed the credit in a suspense account. Instead of doing this, the bank accepted Brown's request to credit them to his personal account without the slightest semblance of actual, apparent, or ostensible authority for so doing, and indeed without even requiring his

endorsement on the checks. The entire scheme to defraud was made possible by the use of the bank's name as payee on the checks, for if Brown had made himself payee he could never have got the checks issued. The essence of the trick was to get money IN the bank and then rely on the bank's disinterest in what happened thereafter to get it OUT and away.

When the bank permitted moneys or credits to come into its possession, it came under a duty to disburse them under proper authority, and for its failure to do so it may be held liable. (*Pacific Finance Corp.* v. *Bank of Yolo,* 215 Cal. 357 [10 P.2d 68]; *Sims* v. *United States Trust Co.,* 103 N.Y. 472 [9 N.E. 605].)

ROTH, P. J.—I dissent. The record demonstrates that Brown, a trusted employee acting within the scope of his authority, was charged with the sole responsibility of preparing check orders which were required to be initialed or signed by two other trusted employees. Brown forged the initials and signature of the other employees and presented the check orders to a clerk who operated a check-writing machine. Thus, the checks in question, bearing facsimile signatures of officers authorized to sign for Credit Managers Association, were completed. The payee of the checks, was the Security First National Bank (Security). The record shows without contradiction that Security had no interest whatsoever in the checks; that Brown was a regular depositor of Security and known to it as an employee of Credit Managers Association; and, further, that Brown, who prepared the check orders, presented the checks severally to Security with deposit slips for his account with Security and that he intended to retain the proceeds thereof, and actually did.

The procedure for issuance of checks by facsimile signatures upon check orders so prepared, initialed or signed and presented to a clerk in charge of a check-writing machine, does, as a pragmatic business practice, make the facsimile signers mere automatons and appoints the persons who are in complete charge of preparing and issuing the checks, the ones who actually draw the checks for the Credit Managers Association. Brown's preparation of check orders and his forgery of the initials and signature on the same was equivalent to the issuance of valid checks with facsimile signatures. The persons whose facsimile signatures were used never saw the checks in question, and it is fair to assume from the record,

meager though it is (which meagerness may be calculated on the part of appellant), that the persons whose facsimile signatures were produced by a check-writing machine, did not see or seldom saw any of the checks which were validly issued by Credit Managers Association at any time.

In these circumstances, the checks here in question were bearer checks.

An almost similar situation was decided to the contrary in *Los Angeles Investment Co.* v. *Home Savings Bank of Los Angeles,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193]. The situation at bench, however, differs from *Home* in a pivotal and sensitive area. In *Home,* a check requisition would be prepared in one of a number of departments. "This requisition was then transmitted to the accounting department, where it was examined and, if found correct, approved and entered on the plaintiff's books. A check in accordance with the demand was then prepared and *presented with the approved demand to the officers authorized to sign checks. Upon being signed, it was returned* to the insurance department for delivery to the party to whom payment was to be made." (Italics added; *Home, supra,* page 603.)

At bench, *all* orders for checks were prepared by Brown and a check was complete when all three of the employees participated in the procedure outlined. In these circumstances, the intent of any of the three, even though one of them imposed on the other two, was the intent of the drawer of the check. Analysis of the *Home* case *supra,* and a factually similar situation is made in *Goodyear Tire & Rubber Co. of California* v. *Wells Fargo Bank etc. Co.,* 1 Cal.App.2d 694 [37 P.2d 483], followed in *Union Bank & Trust Co.* v. *Security-First National Bank,* 8 Cal.2d 303 [65 P.2d 355]. It may be contended at bench predicated upon analogy to the factual situation in *Home* that the two employees who were called on to initial or sign orders prepared by Brown, were the drawers of the check, to the exclusion of Brown, who merely prepared the orders, and that only one or the other of the persons who signed or initialed the order, could fix an intent as to a fictitious payee. However, no person accepting any check drawn by Credit Managers Association, ever knew who the persons were who signed the orders prepared by Brown or ever saw their respective initials or signatures. Security did not and no teller of Security who ever received a check of Credit Managers from Brown for deposit to his personal account, ever

saw the signature or initial of the employees who signed Brown's check orders. The named and authorized signatures for the checks of Credit Managers Association, were represented by facsimile signatures. Since the signatures of the persons who theoretically drew the checks were facsimiles, and completed checks could be obtained by presenting initialed check orders to a *clerk* in charge of a check-wiring machine, the pragmatic business routine of Credit Managers Association required all three to draw the checks. Credit Managers had therefore, by process of automation, legally transferred all responsibility for drawing of checks from the facsimile signers to Brown and the two employees who initialed check orders prepared by him.

The failure of respondent's teller to place the checks here scrutinized in the large item bin, when deposited by Brown to his account, is irrelevant. This procedure was for the protection of the receiving bank, to wit: Security. It is not unusual for depositors to make substantial deposits by checks which are not "money good" and for the depositor to immediately thereafter draw against such deposits. The large item bin is designed to permit an officer of the receiving bank to authorize a "hold" against withdrawal of moneys predicated on the fact that the check is "money good".

Tellers are not expected to be lawyers and when a depositor offers a check for deposit payable to the receiving bank, together with a deposit slip in his name, such procedure is equivalent to endorsing the check. The depositor, to wit: the person who received the money, is always known to the bank. The natural assumption of a reasonably intelligent or even sophisticated bank teller would be that it was presented for deposit and drawn to the bank, rather than to cash, out of an excess of caution to make it more difficult in the event of loss of the check for a non-entitled person to obtain the proceeds.

The notations in the upper left-hand corner of the checks here involved are commonly placed on checks and constitute the reasons for making the checks. The writing on the check is for the convenience of the maker. Such memoranda do not render the check conditional in a negotiable sense. The check with or without memoranda, from a standpoint of negotiability, is an unconditional order to pay within the meaning of section 3084 of the California Civil Code, as it existed prior to January 1, 1965, or within the meaning of section 3105 of the Uniform Commercial Code which superseded the Civil Code section.

If the checks were bearer checks, the question of negligence is not pertinent. However, if this case turns on negligence, the record shows that the trial judge on ample uncontradicted evidence and proper inferences drawn therefrom, specifically found the facts against appellant and in favor of respondent.[1]

The transactions here in question were, at the time they were consummated, governed by section 3090, subdivision (3) of the Civil Code as it existed prior to January 1, 1965.

Effective January 1, 1965, the Civil Code section referred to was superseded by the enactment of the Uniform Commercial Code and was assimilated into sections 3111 and 3405 of the Uniform Commercial Code. I express no opinion as to whether the checks would be bearer paper under the sections of the Uniform Commercial Code referred to, although the quotations by the majority from the official comments in respect of said sections fortify my tentative belief that nothing in the Uniform Commercial Code changes the construction required by section 3090, subdivision (3) of the Civil Code, as it existed prior to January 1, 1965.

Finally, there is a real question as to appellant's right of subrogation.

An excellent treatise on the law of subrogation against banks on forged checks including a table of the jurisdictions which have decided the issue is contained in 51 Cornell Law Quarterly 441 (1966). In *Meyers* v. *Bank of America,* 11 Cal. 2d 92, the court said at page 102 [77 P.2d 1084]:

"Thus, it may be observed that there are two lines of cases governing the questions here presented, each wholly at variance with the other. We think the great weight of authority rests with the group last referred to, and that the principles

---

[1]"Defendant was innocent in any wrongdoing with respect to the things and transactions alleged in the complaint, and for that reason plaintiff is not subrogated to any rights of Credit Managers Association of Southern California as against defendant, and plaintiff is not entitled to maintain the within action.

"As between defendant and Credit Managers Association of Southern California, the two parties were not equally innocent, and said Credit Managers Association of Southern California placed Nolan B. Brown, by virtue of his employment, in a position where he was able to perpetrate the embezzlement hereinbefore described. For that reason neither Credit Managers Association of Southern California nor plaintiff is entitled to maintain the within action against defendant.

"Credit Managers Association of Southern California was negligent in its office practices and procedures and such negligence was the proximate cause of the embezzlement and misappropriation of funds by Nolan B. Brown as herein-before set forth."

there announced, in good conscience ought to be applied to the circumstances of this case. As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties.[2] Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against a bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss. Under the facts of this case, as is stated in *Northern Trust Co.* v. *Consolidated Elevator Co.,* 142 Minn. 132 [171 N.W. 265, 4 A.L.R. 510] : 'The right to recover from a *third person* does not stand on the same footing as the right to recover from the *principal.*' (Italics added.)

"Our conclusion, as hereinbefore has appeared, is that since the bonding company had no superior equities, it was not entitled to be subrogated to any claim plaintiff might have had against the bank." (*Traner* v. *Crocker Anglo National Bank,* 173 Cal.App.2d 779 at pp. 781-782 [343 P.2d 974].) See also, *Fidelity & Deposit Co. of Maryland* v. *De Strajman,* 215 Cal.App.2d 10, 12 [29 Cal.Rptr. 855].)

I would affirm.

---

[2]See findings of trial judge, note 1, *supra.*